# Perkins et al. *v.* Philadelphia.

*Statutes—Delegation of municipal function to commission—Act of May 24, 1893—Constitutional law.*

The act of May 24, 1893, entitled " An act to abolish commissioners of public buildings and to place all public buildings heretofore under the control of such commissioners under the control of the department of public works in cities of the first class," violates article 3, § 20, of the constitution which provides that " the general assembly shall not delegate to any special commission . . . . any power to make, supervise or interfere with any municipal improvement, money, property or effects or perform any municipal function whatever."

The special commission which, by the act of August 5, 1870, was delegated to certain commissioners by name, was, by the act of May 24, 1893, withdrawn from them and delegated to the head of the department of public works, another commissioner.

The act of May 24, 1893, while abolishing or removing the commissioners does not abolish the commission.

*Title of act—Constitutional law.*

The act of May 24, 1893, entitled " An act to abolish commissioners of public buildings and to place all public buildings heretofore under the control of such commissioners under the control of the department of public works in cities of the first class," which, in § 2, repeals the act of August 5, 1870, and the proviso to section 1, article 4, of the act of June 1, 1885, and saves from repeal the act of March 26, 1867, creating the Fairmount Park Commission, violates article 3, § 3, of the constitution, which provides that " no bill shall be passed containing more than one subject, which shall be clearly expressed in the title."

*Classification of cities—Local legislation.*

The legislature may lawfully classify cities for corporate purposes, and an act to promote such purposes is not local or special merely because, at the date of its passage, there was but one city to which it applied; but if the act is intended to apply to but one particular city, county or township, and is not intended to and could never apply to any other, it is local and therefore unconstitutional.

The act of May 24, 1893, abolishing commissioners of public buildings and placing all public buildings theretofore under the control of such commissions under the control of the department of public works in cities of the first class violates article 3, § 7, of the constitution, which forbids the general assembly to pass any local law regulating the affairs of cities.

The act applies solely to Philadelphia, and to but one particular building in that city, and regulates the affairs of that city by placing in the control of the head of the department of public works a particular building, thereby imposing upon him a duty not before belonging to his department.

*Statutes—Implied repeal—Surplusage.*

The act of 1893 cannot be sustained by treating part of the act as sur-

plusage, and construing the rest as working an implied repeal of the act of 1870.

*Constitutional law—Co-ordinate branches of government—Comity.*

Where an act is clearly unconstitutional, no considerations of comity for the legislature as a co-ordinate branch of the government will relieve the Supreme Court of the duty of declaring the act void.

*Constitutional law—Public sentiment.*

In determining the constitutionality of an act, the Supreme Court cannot consider public sentiment, although such sentiment may be unanimous in favor of sustaining an unconstitutional act.

*Constitutional law—Notice of proposed local legislation.*

The Supreme Court cannot declare void an act certified by both houses and approved by the governor, because it had not been advertised in the locality affected, in compliance with section 8, article 3, of the constitution. The court is bound to presume that all precedent formalities had been complied with.

McCollum, Mitchell and Thompson, JJ., dissent.

Argued June 1, 1893.    Bill in equity by Samuel C. Perkins, William Brice, Mahlon H. Dickinson, Isaac S. Cassin, Thomas E. Gaskill, John L. Hill, Richard Peltz, William S. Stokley, Hiram Miller and William H. Wright, constituting a majority of the commissioners for the erection of the public buildings, and all of the members thereof excepting the mayor of Philadelphia and the presidents of the select and of the common councils, against the city of Philadelphia and James H. Windrim, director of the department of public works of said city. Before Sterrett, C. J., Green, Williams, McCollum, Mitchell, Dean and Thompson, JJ.

Bill to restrain defendants from interfering with construction of public buildings by plaintiffs.

The averments of the bill and the decree of the Supreme Court granting a special injunction, together with the arguments of counsel, appear at page 539, above.

Opinion and reasons for decree of July 19, 1893, by Mr. Justice Dean, October 2, 1893:

By act of 5th of August, 1870, what is known as " The Building Commission " of Philadelphia was created.    It was authorized to erect public buildings for the use of the several courts, and other municipal purposes in the city ; to locate them either on Washington or Penn Square, as should be determined by a vote of the people at the general election in October, 1870 ;

procure such plans adapted to either of said sites as, in their judgment, might be needful; employ competent architects, assistants and other employees; fix the compensation of each person employed by them, and do all other acts necessary, in their judgment, to carry out the intent of the act in relation to said public buildings; to fill vacancies caused by death, resignation or otherwise, of any of the members of the commission; make all needful contracts for the construction of said buildings, which contracts, when approved by a majority of the commission, should be binding upon both the city and the contractors; make requisitions on the city councils prior to 1st day of December in each year for the money required for the purposes of the commission the succeeding year, the amount to be expended by the commissioners being strictly limited to the sum required to satisfy their contracts for the erection of said buildings, and for the proper and complete furnishing thereof. The act further directed that any part of said buildings, when completed, should be occupied by such branches of the municipal government as they were intended for, and the present buildings on Independence Square, except Independence Hall, as soon as the public buildings were entirely completed, should be removed. Further, it was made the duty of all branches of the city government to do and perform all such acts in aid of the intent and purpose of the act as the commission might, from time to time, require.

Under this act, the commission organized, and has since been in uninterrupted existence down to 24th of May, 1893. An attempt was made in the Constitutional Convention of 1874, when the section which prohibited the legislature from creating such commissions was under discussion, to amend it by adding, " And all such commissions now existing are hereby abolished," but the amendment was rejected. Then, when the act of 1885, providing for corporate government of cities of the first class, was passed, a saving clause against the repeal of special acts was inserted.

So that the existence of the commission, endowed with all the great powers we have mentioned, is not open to question. Whether it was wise to thus invest the servant with the right of the master over the master's business and master's purse, is not for us to inquire. Such special laws could be passed, and often were passed, before the new constitution went into effect.

The commission organized 27th August, 1870, and for twenty-three years has prosecuted the work intrusted to it, and this work is now approaching completion.   Exasperating delay on the part of the commission is alleged; extravagance, mismanagement and dishonesty are more than insinuated.   It is averred, it has so conducted the work as to arouse the hostility of the city, and prompt a practically unanimous demand for the repeal of the commission, which demand was responded to by the act of 24th May, 1893, now before us.   The plaintiffs aver this is unconstitutional, and must be so pronounced, and they ask that any interference by the city with the commission in charge of the work be restrained.   The defendant, the city, affirms the constitutionality of the act, and, as a consequence, alleges that, from the date of its approval by the governor, the commission ceased to exist, and the city, in resuming possession of the public building, did so in accordance with law.

The first section of the act abolishing the commission is as follows :

" An act to abolish the Commissioners of Public Buildings and to place all Public Buildings heretofore under the control of such Commissioners under the control of the Department of Public Works in cities of the first class.

" Section 1.  Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by authority of the same ; That commissioners created by any special act of assembly for the erection and construction of any public buildings, required to accommodate the courts, and for municipal purposes, in cities of the first class in this commonwealth, are hereby abolished, and the erection, completion, construction, repair, removal and protection of all public buildings heretofore under the control of such commissioners in said cities shall be under the direction, control and administration of the department of public works."

The constitutional power of the legislature to repeal the special act creating the " Building Commission," is not denied by complainants ; that it should be repealed, if the city of Philadelphia so desires, cannot be denied.   But the contention here is not determined by either the right to repeal or the duty to repeal.   Is the act of 24th May, 1893, a lawful repeal of the

special act of 5th of August, 1870, or is it itself a special act
violative of the constitution ? It does not purport to be an act
for the repeal of the act of 1870. It is entitled, "An act to
abolish," not the "commission," the warrant or authority by
which they exercised power, but the "commissioners," those
who exercised the authority, "and to place all public buildings
heretofore under the control of such commissioners, under the
control of the department of public works in cities of the first
class." Its declared purpose is the removal of the commis-
sioners and the transfer of their authority to the department of
public works. The title of an act is part of it; it limits its
scope, and is properly used in interpreting its words : Pa. R.
R. Co. v. Riblet, 66 Pa. 164. We therefore turn to that part
of the act which follows the title.

The first section of the act, then, in pursuance of the one
subject clearly expressed in its title, enacts : "That commission-
ers created by any special act of assembly for the erection and
construction of public buildings required to accommodate the
courts and for municipal purposes in cities of the first class, are
hereby abolished." Up to this point, the commissioners are
undoubtedly removed, and their offices are vacated, but the
commission is still in force. The same section then goes on to
say : "And the erection, completion, construction, repair, re-
moval and protection of all public buildings heretofore under
the control of such commissioners in said cities, shall be under
the direction, control and administration of the department of
public works."

The first section of the bill thus follows strictly the declared
purpose of the act in the title. The commissioners are remov-
ed, and all their powers and authority are conferred on the de-
partment of public works.

We now turn to the legislation for cities of the first class, to
ascertain what person or persons shall perform the duties there-
tofore imposed upon the removed commissioners. Section 1,
article 4, of the Bullitt Bill provides, that : "The department
of public works shall be under the charge of one director, who
shall be the head thereof." Then article 12 of section 1 of the
same bill enacts, that, among other officers : "The mayor shall
nominate, and, by and with the advice and consent of select
council, appoint the director of public works." The vacancy

thus created by the removal of the commissioners, is thus filled by an officer appointed by the mayor, with the consent of select council.

Assuming, then, that the legislature did not intend to pass a bill containing more than one subject, and that clearly expressed in its title, the first section of the bill in apt words clearly accomplished its purpose; but the special act of 5th of August, 1870, still stood in full force on the statute book, with all its special and large powers relating specially to Philadelphia, to be performed, not by the old commissioners, but by the officer appointed by the mayor.

Certainly, it needs no argument to show that the special powers enumerated in the act of 5th August, 1870, when conferred on any officer, is a violation of section 20, article 3, of the constitution : " The general assembly shall not delegate to any special commission . . . . any power to make, supervise or interfere with any municipal improvement, money, property or effects . . . . or perform any municipal function whatever." The special commission which, by the general assembly of 1870, was delegated to certain commissioners, was, by the general assembly of 1893, simply withdrawn from them and delegated to the head of the department of public works, another commissioner. The fact is not material that the new commissioner was already by general law an officer of the city; the special and unusual power given him, to be exercised in a special manner, with reference to one particular building, constituted the special commission delegated to him. The first section, then, which fulfills the promise of the title, creates a vacancy in the office of commissioner, and fills it with the nominee of the general assembly. The authority of the general assembly of 1870, under the constitution of 1838, to delegate such power to a special commission, was clear; that of the general assembly of 1893, under the constitution of 1874, was peremptorily forbidden. This is not an act increasing the duties and enlarging the powers of the head of the department of public works in cities of the first class, but an act abolishing commissioners of public buildings, and transferring their powers to another in such cities. There is just one city of the first class, Philadelphia; just one set of commissioners to erect public buildings for the use of the courts and municipal purposes, created by any

special act of assembly; so there can be no doubt as to the specialty of the commission delegated, nor of the nature of the powers conferred.

If the powers of the commission, by a simple repeal of the act of 1870, had passed to the city, the department of public works, as such, would have taken nothing. If the city decided to proceed with the work of building, the direction of the actual labor would have fallen, by virtue of the subdivision of executive powers of the city, upon this department. But the act of 1893 proceeded to gather up carefully all the powers of the old commission, and deposit them, not with the city, but in the lap of the director of public works. By a repeal, the extraordinary powers of the commission would have ended with its own life; the ordinary powers would have fallen back upon the city to be exercised in the ordinary manner; the department of public works would have performed such work and only such as councils, in the exercise of their paramount " direction, control and administration " of municipal affairs, might have seen fit to direct. Under the Bullitt bill the department of public works can only take through the city; if the powers of the commission had passed to the city, the department, as such, would have taken nothing; the direction of the actual labor would have been with it, by virtue of being one of the nine subdivisions of the executive power of the city. But under the act of 1893 this department is named as the sole legislative donee of the powers of the commission. It takes not from or through the city, but independently of it, and directly from the commonwealth. Its title is subject to no condition or trust, but is absolute and independent; as much so as that of the old commission.

Taking the title and first section of the act together, and treating the second section as surplusage, it is legislation prohibited by section 20, article 3, and therefore cannot stand.

But does the second section, when read in connection with it, enable us to sustain the act as a whole? This second section contains three legislative declarations: (1) Repeals the act of 5th of August, 1870. (2) Repeals the proviso to section 1, article 4, of the general act of 1st of June, 1885, saving the act of 5th August, 1870, from repeal. (3) Saves from repeal the act of 6th of March, 1867, appropriating grounds

for public purposes in the city of Philadelphia. All three are subjects different from that announced in the title. The purpose of legislative action as stated in the title, is to remove commissioners of public buildings, and transfer their powers and control to another; this purpose, as we have seen, is fully carried out by the language of the first section. But then, another subject is taken up; the act creating the commission is repealed, and a proviso inserted saving from repeal the act of 26th of March, 1867, creating the Fairmount Park Commission and placing in its control the property and public buildings of the Park. Neither of these subjects is hinted at in the title, and both are distinct from the subject announced in the title, and at variance with the purpose there disclosed. The title, in substance, professes to abolish the commissioners and keep alive the commission. So far as words can do this, it is done in the first section. But then the legislative mind changes and the second section strikes down the one commission and saves another. Therefore, the bill contains more than one subject and cannot stand as a whole, because of section 3, article 3, of the constitution: " No bill shall be passed containing more than one subject, which shall be clearly expressed in the title."

It is argued by counsel for the city that the second section of the act is supererogatory, and that all of the first section except the first sentence was needless. With all but the first sentence eliminated, the act would stand thus : " Commissioners created by any special act of assembly for the erection and construction of public buildings required to accommodate the courts and for municipal purposes in cities of the first class in this commonwealth are hereby abolished."

Treating this as the whole of the act and all the rest as surplusage, it is averred there is such a positive repugnance between it and the old act as necessarily works the repeal of the commission.

We have given this point most careful consideration, with a desire, if possible, to treat the act of 1893 as simply a repeal of that of 1870. But the significant language of the later act warrants no such construction; abolishing the commissioners does not touch their commission; there is only a vacancy in the office. Besides, the legislative intent is so manifest in the

title and first section of the act to oust the commissioners and save the commission to the department of public works, that it would do positive violence to the obvious natural meaning of words, were we to treat the whole act as one repealing the former act. It is our desire, as well as a judicial duty, to sustain and enforce all acts of assembly which do not manifestly transgress against the constitution, but we cannot frame new bills which are constitutional, and substitute them for older ones which are not.

The plaintiffs further aver that this bill violates section 7, article 3, of the constitution : " The general assembly shall not pass any local or special law. . . . regulating the affairs of counties, cities, townships, boroughs, or school districts."

This act purports to be a general law applicable to cities of the first class. We have held, and now adhere to it, that the legislature may lawfully classify cities for corporate purposes, and that an act to promote such purposes is not local or special, merely because, at the date of its passage, there was but one city to which it applied. But it has been decided in case after case, since the constitution of 1874 went into effect, in positive unmistakable language, that if the act was intended to apply to but one particular city, county or township, and was not intended to and could never apply to any other, it was local and therefore unconstitutional. This act is nominally general ; applies in terms to cities of the first class ; abolishes commissioners of public buildings for the use of courts and municipal purposes in such cities, created by special acts of assembly, and places all buildings heretofore under their control in the control of the department of public works. At the date of its passage there was just one city, one set of commissioners, one special act of assembly, one public building, to which it could apply ; from the very nature of the case, there never could be another city in the first class to which the act could apply, for it transfers to the department of public works buildings heretofore under the control of such commissioners ; no matter how many cities come into this class, nor how soon they reach it, this act cannot apply to them, for their affairs have not heretofore been regulated by the special provisions of any such act as that of 1870.

In fact it is not denied that the act applies solely to Phila-

delphia, and to but one particular building in that city, and regulates the affairs of that city by placing in the control of the head of the department of public works a particular building heretofore under the special control of a special commission with special powers. It even goes further, and in express terms imposes upon him a duty not theretofore belonging to his department. The act of 1870 directed the building commission, on the completion of the City Hall, to remove all the buildings on Independence Square except Independence Hall, and place the ground in good condition; the general act of 1885 put in charge of the director of public works in cities of the first class "the construction, protection and repair of public buildings;" the act of 1893 divests councils of any control over this subject as effectually as the act of 1870, by inserting the word "removal." as among the new duties imposed upon the director of public works. In every sense of the words of the constitution, the act is local, special, and regulates the affairs of the city to the exclusion of the municipal legislature, the city councils. True, it does this under the guise of a general law; but as is said in Scowden's Appeal, 96 Pa. 425, City of Titusville case: "It requires but a glance at the act to see that it is an attempt to evade the constitution. It is special legislation under the guise of a general law. Of all forms of special legislation this is the most vicious. . . . It is merely an attempt to legislate for certain cities of the fifth class to the exclusion of all other cities of the same class."

It cannot be pretended that the act of 1893 can have any application to any other city than Philadelphia which may subsequently come into the first class. If a dozen cities, by reason of increase of population, had come into the class since the act of classifying cities was passed, no one of them would have been affected by the act of 1893, because, while each would, under the general act of 1885, have had a department of public works, no one of them would have had, in such department, the special powers here transferred to the department of public works in Philadelphia.

The act stands before us, as if the legislature had given it this form: "The Commissioners of Public Buildings in the city of Philadelphia, holding office under the act of 5th of August, 1870, are hereby removed, and all their powers and duties

under said act, with reference to the erection of city hall in said city of Philadelphia, together with the duty of removing buildings from Independence Square, are hereby delegated to the head of the department of public works in said city, and all acts inconsistent with this act are hereby repealed except the act of 26th of March, 1867, which places in the control of the commissioners of Fairmount Park the public buildings in said park ; and it is further enacted, that this is not local and special legislation, but it is a general law for the government of cities of the first class in this commonwealth."

This is the act of 1893 stripped of a disguise so thin that it can scarcely be called one, and brings it directly within the prohibition of section 7, article 3, of the constitution, as clearly as was decided in Scowden's Appeal, the act of April 18, 1878, regulating the affairs of the city of Titusville and Crawford county, came within the same prohibition.    To the same effect as Scowden's Appeal, are Davis v. Clark, 106 Pa. 377 ; McCarthy v. Commonwealth, 110 Pa. 246 ; Scranton v. Silkman, 113 Pa. 191; Morrison v. Bachert, 112 Pa. 322; Ayar's Appeal, 122 Pa. 266, and many others.

It may be asked, then, cannot a city or other municipality, because of the constitutional prohibition, rid itself of obnoxious local and special laws antedating the present constitution? We answer, certainly it can, if that be the real end in view. The very same article 3, section 7, which forbids local and special legislation, points the way so plainly, that, of all forms of legislation, it is subject to the least uncertainty.  ˙It says, after enumerating what laws shall not be passed: " But laws repealing local or special laws may be passed." Under this express constitutional authority, an act of a dozen lines, repealing the act of 5th of August, 1870, would have ousted the commissioners and obliterated the commission.    All the rights of the city over its own property, with the control of its own purse, would at once have been resumed.    Then, through councils, the direct representatives of the people, by ordinances, City Hall could have been completed, the old buildings on Independence Square removed, in a time and way and at such cost as to the city seemed proper.    Why this easy path to the professedly desired end was not followed, we do not know ; we do know, however, that, whether this act was designed with a view to evade the

prohibitions of the fundamental law, or those having it in charge, in haste to accomplish a lawful purpose, carelessly and unlawfully framed it, the result is the same; as it and the constitution cannot stand together, the act must fall.

The argument, that every reasonable intendment should be made in favor of the constitutionality of a law enacted by a co-ordinate branch of the government, appeals to us with much force. But the matter to be determined is purely judicial; a spirit of comity can only impel us to a careful consideration of the question; it cannot determine the answer; that must be found in the language of the act, and the manifest intent of the constitution. If this act be sustained, the same sort of legislation can regulate the affairs of the most insignificant borough in the commonwealth, and we may expect a flood of the same vicious local laws which preceded the adoption of the constitution of 1874. It is certainly not forgotten, that the well-nigh unanimous demand which brought the convention of 1873 into existence, was prompted by the evils springing from local and special legislation. That convention, direct from the people, composed of the ablest and most experienced citizens of the commonwealth, framed this article 3 on legislation. Assuming, what was the settled law, that the general assembly had all legislative power not expressly withheld from it in the organic law, they set about embodying in that law prohibitions which should, in the future, effectually prevent the evils the people complained of. Article 3 is almost wholly prohibitory; it enjoins very few duties, but the " thou shalt nots " number more than sixty, among them sections 3, 7 and 20, which we here decide to be transgressed by this act. That constitution, with this article the most prominent feature of it, was adopted by an unprecedented majority on a direct vote, indicating a settled determined purpose on part of the people to hold back from the legislature the power to enact local and special laws. Every department of the government is bound by its provisions, but especially is this court, for on it is the duty of judicially determining any violation of it. The state as a whole is subject to it; the largest municipality as well as the smallest township. Yet it is a fact that, notwithstanding the respect which, as citizens of a free commonwealth, we all have for the fundamental law, since 1874 more than three hundred bills have been passed by the legisla-

ture, which four governors have vetoed because they were un-
constitutional; nearly one hundred of these because they violated
section 7, article 3, prohibiting local and special laws. In the
same time, thirty-three, which received executive approval, have
been pronounced unconstitutional by this court, most of them
because violative of the same section 7, article 3. When we
consider that no special duty of judicial ascertainment of the
constitutionality of legislation is imposed on the executive de-
partment, we must assume, these vetoed bills were so palpably
unconstitutional that, under the oath taken by the head of that
department, he could not conscientiously affix his signature to
them; and the correctness of that assumption is all the more
probable from the fact, that more than one third of the mem-
bers of the general assembly must have concurred in his ob-
jections, for, so far as we can discover, in no instance were any
of them passed over his veto. During the session at which this
bill was passed seventy-three were vetoed; thirty-seven or more
than one half were refused signature because violative of the
constitution; of these thirty-seven, twelve transgressed sec-
tion 7, of article 3, against local and special legislation, and
most of the others, sections 3, 18 and 20 of the same article.
Why such a fact exists, of course, must be in a great degree
conjectural. Mr. Buckalew, in his excellent work on the con-
stitution of 1874, noticing that for the legislative session of
1879, Governor Hoyt had vetoed thirteen bills because clearly
violative of prohibitory clauses in article 3, suggests, as the rea-
son, that the old habits of special legislation prior to 1874 were
" thrown off with difficulty and often with reluctance." But
this explanation does injustice to the legislative branch. . The
general assembly of the commonwealth is just as devoted to
the constitution as either of the other departments of the gov-
ernment. In no like period, since the foundation of the com-
monwealth, as since 1874, has the material and intellectual
advancement of the whole people been stimulated and fostered
by so many wise and beneficent laws. But the legislature be-
ing quickly responsive to local public sentiment, and having no
duty of determining purely judicial questions, honestly attempts
legislative advancement of local interests or legislative relief
from local evils. Bills framed to accomplish such purposes are
often met and stricken down by a constitution highly restric-
tive, and bristling with specific prohibitions.

This is no imputation on either the integrity or patriotism of the popular branch of the government. Under the circumstances it would be strange if the fact were otherwise.

But, being the fact, what reasonable intendment in favor of the constitutionality of an act is to be made from its passage by the general assembly? What is the reasonable presumption of law from that fact? The law presumes all departments of the government will observe the constitution, for all are alike sworn to do so; but if an infringement of it be alleged, we can only determine that question by an impartial scrutiny of the statute, and by giving the constitution its fair, natural and obvious meaning; in so doing, caution in arriving at an opinion adverse to the statute is a duty; so is firmness in pronouncing one when formed. This is all the law enjoins.

Neither the law controlling us in the exercise of the duty, nor, since 1874, any extreme rarity of unconstitutional acts of assembly, warrants such intendment in favor of a bill as relieves us from the necessity of a judicial inquiry, which, it seems to us in this case, leads, inevitably, to a conclusion adverse to its constitutionality.

Another point made in the argument before us—that the public sentiment of Philadelphia with practical unanimity demanded the passage of this law, was doubtless more effectively urged before the legislature. But the question presents itself to us in a different shape; we do not believe the intelligent public sentiment of the greatest city of the commonwealth demands the accomplishment of a lawful purpose by unlawful means; unconstitutional statutes are the very essence of lawlessness. Even if the unanimous public sentiment of the city demanded the enforcement of this act, we could not heed it. Public sentiment, properly, may move courts, in matters wholly discretionary, such as the adoption of rules to speed causes, afford quick relief to suitors, and eradicate abuses in the administration of justice; but such sentiment can have no place in the interpretation of a constitution; the public sentiment expressed in that instrument is the only sentiment of which a court can take notice; it contains the deliberate, emphatically expressed sentiment of the whole people; they, and they alone, can change or amend it in the way provided in it, but even they cannot trample upon it. If laws in conflict with it be passed by the legislature,

be approved by the governor, and sustained by this court, that is revolution. It is no less revolution because accomplished without great violence. It matters little to the house owner, whether the structure intended to shelter him be blown up by dynamite or the foundation be pried out, stone by stone, with a crowbar; in either case he is houseless. There can be no stability in a free government, if successful assaults in any department be made on the fundamental law;—the supreme law, deliberately established by the whole people as a rule of action in all governmental matters affecting their welfare.

As to the averment, that the act also violates section 8, article 3, because notice of the proposed legislative action was not published in Philadelphia at least thirty days before the introduction of the bill, we can only say, it is not our duty to go behind the law to inquire whether all the precedent formalities have in fact been complied with. The evidence that notice has been published is to be exhibited to the general assembly; it is not directed to be entered on the journals. The law before us is certified by both houses and approved by the governor. We must presume the requirement as to notice was complied with; to this effect are all the authorities of numerous adjudicated cases on the same question.

NOTE. The court being pressed for a speedy decree in this case by both parties, within half an hour after it was agreed upon in consultation, it was filed. There was no time then to prepare and file an opinion with the decree. Therefore, I was requested by the Chief Justice to prepare an opinion embodying the reasons of a majority of the court for granting the preliminary injunction, to be filed at October term at Pittsburgh. While I feel sure the subject could have been more ably discussed by any one of my brethren, I am, nevertheless, confident, no one of them is clearer in his conviction that the decree is right on both reason and authority.

DISSENTING OPINION BY MR. JUSTICE MITCHELL, October 2, 1893:

The intention of the legislature in the act of 1893 is perfectly clear, and its object entirely constitutional. The objections to the act are to the mode in which that intention and object are

sought to be accomplished. If these objections are substantial, then no matter how well meant and desirable the purpose, it must fail. That is the penalty of living under the present constitution, pervaded as it is by a profound distrust of the legislature. In the impatience of the people with some of the evils of special legislation, they have rushed to the other extreme, and so hedged about and bound up the legislative arm of the government that legitimate and necessary powers can be exercised only with difficulty if at all. Article 3, On Legislation, contains, as our brother DEAN has pointed out, sixty specific prohibitions, besides other restrictions and regulations not absolutely prohibitory. It is a barbed wire fence around all legislative action, bristling with points of danger even to the most honest, and desirable, and essential laws. A literal adherence to all its provisions would have stopped the wheels of government, and so this court was forced to hold when the first great question of the needs of municipal legislation came before it. Some elasticity was absolutely indispensable, and it was found in the principle of classification.

I make these observations and this illustration to call special attention to the necessity of reading the constitution, where it relates to the powers of the legislative branch of the government, in a broad and liberal way, looking to its spirit as more controlling than its mere words. If a statute does not offend against the spirit, does not really do the thing which the constitution means to prohibit, then it should be sustained, although its form may be liable to objection under the strict words of the prohibition.

The act under consideration is drawn with great carelessness or over-confidence. The objections to its form are manifest and admitted. Even the argument of the very skillful and learned counsel for the respondents is an apology, and a plea to save it notwithstanding its undeniable faults. In this argument I entirely concur. As already said the general intent of the act is clear, and its object entirely constitutional. Looking at this object and intent the objections to its form do not seem to me sufficiently deep-seated to require us to hold that it transgresses the real meaning of the constitutional prohibitions. It will be sufficient without elaborating the discussion, to indicate in a general way, the reasons why I think it can and ought to be sustained.

First. The creation of a new commission, consisting of the Department of Public Works, does not seem to me the necessary result of the act. It is no part of the general intent, which is to abolish the commission created by the act of 1870 and transfer its powers to the city of Philadelphia. The designation of the Department of Public Works is merely the naming of that branch of the city government to which the act of 1885 would commit the subject, had the present act briefly repealed the act of 1870 without more. The transfer of the powers of the old commission to the Department of Public Works, is a transfer to the office, not to the incumbent, and is therefore really to the city of whose government the office is a part. The naming of the agent instead of the principal is not material, because the whole scope of the act shows that it is not a grant of power to the agent individually, but to him as agent and representing the principal. This conclusion is plain from the fact that if all this part of the statute had been omitted, the result would have been exactly the same. The existing law, the act of 1885, would in that case have transferred the power to the same place where this act expressly puts it, namely, the Department of Public Works. At most, this part of the act is surplusage, and should not be allowed to vitiate the whole.

Secondly. The objection that the act covers more than one subject, rests on the view that it creates a new commission. If the construction indicated in the preceding paragraph be adopted, this objection disappears.

Thirdly. The act is applicable to all cities of the first class, and relates to a subject of municipal government. It therefore comes within the decisions sustaining the classification of cities and is a general law.

Fourthly. Even if the first section of the act be construed to create a new commission, and therefore to be unconstitutional, the second section is free from that objection and can stand by itself as a valid repeal of the act of 1870. It is clearly severable, and therefore not involved in the invalidity of section first, if that be conceded for the argument's sake. Nor do I find the objection that section second contains more than one subject insuperable. The only real subject is the repeal of the act of 1870, and having expressly enacted that, the section proceeds to repeal a section of the act of 1885 which had preserved

the commission under the act of 1870, and therefore might be thought to conflict with the present act. But in repealing that section of the act of 1885 without qualification, the act of 1867 creating the Park Commission would also be repealed, which was not intended or desired, and therefore a saving proviso was added with regard to this last act.

In all this there is nothing but the one subject, the repeal of the act of 1870 and thereby the abolition of the commission created by it. The repeal of the section of the act of 1885 was a part of the same purpose, and the proviso as to the Park Commission was necessary in order to limit the repeal to the object really intended. It no more introduced a new subject than the usual clause repealing all laws and parts of laws inconsistent with a new enactment.

For these reasons I am of opinion that the injunction should be dissolved.

DISSENTING OPINION BY MR. JUSTICE THOMPSON, October 2, 1893:

The contention of the plaintiffs is that the act of the general assembly, approved May 24, 1893, is within the inhibition of the constitution, because it conflicts with its prohibition of amendments, revivals or extensions of acts of assembly by their titles, because it violates its mandate forbidding the enactment of special or local laws regulating the affairs of any city or county, because it was not advertised as required in cases of special or local laws and because it is an attempted delegation of a municipal duty to a special office or department.

The act of Aug. 5, 1870, constituted certain citizens, together with the mayor and the president of the select and common councils, commissioners, for the erection of the public buildings required to accommodate the courts and for all municipal purposes, and authorized them to make their location upon either Penn Square or Washington Square, to be determined by a vote of the people, and to execute contracts for their construction. It empowered them to make requisition upon the councils for the money necessary in each year for their expenditures, for which special taxes were required to be levied. This act thus authorized the heads of executive and legislative departments of the city, and those citizens who were associated with them,

to perform a function municipal in character and significantly made so by associating in its performance the chief representatives of those departments of the city government and by requiring all "its officers to do all acts in aid and promotion of it." The act of June 1, 1885, entitled an "act for the better government of cities of the first class in the commonwealth," is a general one, and a city whose government is organized under and by virtue of it becomes distinctively a member of that class. Philadelphia being thus organized, is by reason thereof constituted a city of such class. The act provides that in such cities the executive power shall be vested in the mayor and in departments with certain defined powers and duties. After providing for their establishment, it enacts: " Councils shall by general ordinances provide for the proper and efficient conduct of the officers of the city, by the mayor and the several departments." It is manifest that while this act, when it was passed, was in fact *then* intended to be applicable to but one city, it nevertheless contemplated the creation of a general class for legislation. Classification by the general assembly has for its purpose general legislation, and, under the constitution, is a legislative method resorted to in order to accomplish it. The title to the act in this contention is " An. act to abolish commissioners . . . . in cities of the first class," and indicates its clearly defined purpose to be legislation for a general class. Its enacting clauses provide for the abolition of commissioners, created by *any* special act of assembly, for the charge, direction and control of public buildings of cities of the first class by the departments of public works, and for the repeal of the proviso in the general act which continued the commissioners. This language very clearly marks out legislation for a class, and as such constitutes general legislation. Its dominating object is the repeal of *any* act creating building commissioners in cities of the first class. As a repealing statute, it would not fall within the limits of the prohibited class of local or special laws. While the constitution prohibits the direct or indirect enactment of such laws, it does not place the same inhibition upon statutes intended for their repeal.. It has not done so because their repeal doubtless in some instances may become necessary in order to effectuate general legislation. The present statute repeals any act creating commissioners, and strikes down their

functions which, without the act creating them, would have been inherent in the designated department. Its entire scope covers this object, and this legislative intent is expressed by no uncertain or doubtful language. Standing as a repealing act, it is not prohibited by the fundamental law.

But this conclusion is resisted because, it is contended, the act overlaps repeal with affirmative legislation. A repeal alone, would, without doubt, have placed the public buildings of a member of the first class of cities in the charge, control and under the direction of the department of public works, for the act organizing the government of such cities provides, " the construction, protection and repair of public buildings," shall be " under the direction, control and administration of the department of public works." The present act, after abolishing commissioners, provides that all public buildings heretofore under the control of commissioners in said cities, "shall be under the direction, control and administration of the department of public works." These words are thus identical with those used in the governing act, and therefore cannot be said to constitute new or additional legislation. With or without the words in question the effect of the repeal would have been the same. Their use was unnecessary, but doubtless the legislature by using them with the words of repeal intended an iteration of the absolute extinction of building commissioners in a manner more clear and emphatic than would have been indicated by a simple repeal. The proposition that the act as a repealing statute is brought within the inhibition of the constitution, because in addition to repeal it contains a substantial iteration of it, would seem like refinement run mad, and, if subtle, would appear to be beyond ordinary comprehension.

But the plaintiffs contend that the repeal is incidental and the act is " intended to apply to one particular city or county and cannot have any application to any other city within the designated class " and is " an attempt to regulate by a special law the affairs of the particular city to which it is applicable," and therefore comes within the grasp of the constitutional prohibition. The history of legislation in this state will attest that the promotion of the public welfare has been best accomplished by a resort to classification, and the exercise of this power for such purpose has never been questioned. Where the popula-

tion in a city or cities has become very great, classification, which has its basis in population, must necessarily constitute an exceedingly limited number of the first class, because their necessities and requirements, in consequence of their great size, are peculiarly distinctive. The limitation in numbers reducing the class even to a minimum can have no effect upon the general character of the legislation in regard to such class. While, therefore, all legislation relating to cities of the first class is necessarily applicable to the city of Philadelphia, as it is the only member of that class, it does not follow that because such is the case the legislation is as a consequence a violation of the constitution.

In Wheeler v. Philadelphia, 77 Pa. 349, it is said by Mr. Justice PAXSON: " But it is contended that even if the right to classify exists, the exercise of it by the legislature in this instance is in violation of the constitution for the reason that there is but one city in the state with a population exceeding three hundred thousand, that to form a class containing but one is in point of fact legislating for that one city to the exclusion of all others and constitutes local and special legislation prohibited by the constitution. The argument is plausible but unsound." Again, he says: " In the mean time is the classification as to the cities of the first class bad because there is only one of the class? We think not. Classification does not depend upon numbers." Again: " If the classification of cities is in violation of the constitution, it follows, of necessity, that Philadelphia as a city of the first class must be denied the legislation necessary to its present prosperity and future development, or that small cities must be burdened with legislation unsuited to their needs. For if the constitution means, what the complainants aver that it does, Philadelphia can have no legislation that is not common to all other cities of the state." Again: " Must the legislation for a great commercial and manufacturing city with a population approaching one million be regulated by the wants and necessities of an inland city of ten thousand? If the constitution answers this question in the affirmative, we are bound by it, however we might question its wisdom. But no such construction is to be gathered from its terms and we will not presume the framers of that instrument, or the people who ratified it, intended that the machinery of

their state government should be so bolted and riveted down by the fundamental law as to be unable to perform its necessary functions."

Philadelphia having its municipal government organized under the general act for the government of cities of the first class and by reason thereof having become a city fixed and established as such among the first class, legislation of a municipal character for that class, although applicable to it alone, as its only member, is general and not special, and the reason for it is that it is based upon classification which has its foundation in legislative necessity. In Weinman v. Passenger Railway Company, 118 Pa. 203, Mr. Justice WILLIAMS says: "For the purpose of local government, the state is subdivided into counties, township and other municipal and quasi-municipal corporations. Each class of these subdivisions has purposes to subserve that are peculiar to it and need to be invested with the powers necessary to that end. Generally speaking, all the members of each class have some local function to perform. Classification therefore upon this basis has been recognized and a statute relating to all the townships, all the school districts, or all the members of any particular class of the municipal divisions of the state has been held to be constitutional. It has been found desirable to divide cities into classes upon the basis of their population. The needs of a great city with a half of a million or more of people are somewhat different in many respects from the needs of a city with ten thousand. The organization of their local governments and the management of their municipal affairs will be quite unlike. Each requires legislation peculiar to itself." In Ruan Street, 132 Pa. 257, it is said by Mr. Justice WILLIAMS, in delivering the opinion of the court: "The force of the argument in support of classification in Wheeler v. Philadelphia, and it is the only line of argument by which it can be sustained, lies in the evident necessity for the possession and exercise of other and somewhat different corporate powers by the city on the seaboard from those required by the inland city—by the city with the population of one million from those required by the city of ten thousand. These great differences in population render it necessary that there should be corresponding differences in the number, character, powers, and duties of the officers by whom municipal

governments are to be conducted and the municipal necessities provided for, and classification was sustained as a necessary means for enabling the legislature to make provisions adapted to secure each class of cities, the corporate powers and the number, character, powers and duties of the officers best adapted to secure its needs without an infraction of the constitution." The constitutional mandate restricting legislation to defined limits has for its object the passage of wise and uniform laws beneficial to the masses of the people, and the prevention of vicious and injudicious enactments advantageous to few persons, and was not intended to defeat or prevent legislation for greatly concentrated population, whose necessities springing from such concentration concern quarantine, health, trade, public buildings, political divisions and finances, and require distinctive legislation. The legislature, confronted with conditions arising from such necessities, has therefore passed laws relating to them as applicable to a class, although existing in a single locality, and has founded such classification upon needs imperatively demanding legislation. The statute in the present controversy relates to a class, whose locality is restricted, and concerns the erection, completion, construction upon and protection of public buildings, a subject that pertains to municipal government so designated in the general act governing cities of the first class, and as essentially so as any object of municipal administration. As it is thus made applicable to a general class and intended for a municipal purpose, the contention that it is special, as the class contains but one member, cannot be successfully maintained, because it has the constituents of general legislation, namely, the class and the purpose. This general character, thus manifested, cannot be modified by the allegation that the motive of the legislature in its enactment was to accomplish a special purpose. The judiciary has nothing to do with the moving causes of legislation, and will always presume that a co-ordinate branch of government is impelled by proper motives and is controlled by a due regard for constitutional mandate. The presumption, that general legislation was intended should therefore prevail, and is in harmony with judicial opinion that legislation, with classification as its basis, is general. In Ayars' Appeal, 122 Pa. 281, the present Chief Justice says: " Laws enacted in pursuance of such classifica-

tion and for such purposes are properly speaking neither local nor special. They are general, because they apply alike to all that are similarly situated as to their peculiar necessities. All legislation is necessarily based upon a classification of its subjects, and when such classification is fairly made, laws enacted in conformity thereto cannot be properly characterized as either local or special."

In Reeves v. Railway Company, 152 Pa. 162, Mr. Justice Mitchell in delivering the opinion of the court sustaining the constitutionality of the act of May 8, 1876, relating to the use of motive power upon passenger railways in cities of the first class, said: "It is claimed however that it transgresses the prohibition of article 3, section 7, of the constitution in that it is a local or special law amending or extending the charter of a corporation. But under the settled construction of this section classification of subjects including cities is permissible and legislation which applies alike to all the members of a class is not local or special but general."

It is contended that the act in question is an act prohibited by the constitution, because it attempts to regulate the affairs of a particular city by a transfer of the functions of the commissioners to a special department or officer. The act, under which its government is organized, creates a department of public works and places under its direction, control and administration and in charge of its director "the construction, protection and repair of public buildings." If when it was passed the proviso excepting the act creating the commissioners had not been incorporated in it, the performance of their functions would have devolved upon that department, and if the commission by its repeal should cease to exist, the same result would necessarily follow. This act, then, in designating a department to which the performance of the functions belong by law, does not thereby create for it any new duty or establish any new commission, body, or department to perform it. It is not an attempt to trench upon the rights of the people to control local administration, but is a general law, having for its object the removal of all restrictions upon such control in cities of the first class, and springs from an imperative demand that the public buildings necessary for their business shall be under the direction of municipal administration. As the city would thus

resume its charge of these public buildings, and in doing so perform that which by law it is required to do, an act which, by repeal, removes any restriction upon its performance and thus leaves it to perform a duty cast upon it by law, is not one regulating its affairs or making any new transfer of its public buildings.

It is said that this act transgresses the article of the constitution which prohibits the enactment of any law containing more than one subject, and requires the one subject to be clearly expressed in the title, but an examination will demonstrate that. it in fact contains but one subject and that which is germane to it. The first section provides for the abolition of the commissioners and follows it with the buildings, the erection, completion, repair, removal and protection of which, had been in their control, shall be under the direction and control of the department of public works. The second section provides for the repeal of the laws creating the commissioners. The title expresses clearly the subject of the legislation. The words of the act designating the department of public works to have control, direction and administration of these buildings, upon the abolition of the commissioners, do not express any new or distinctive subject of legislation. They indicate, as shown,. only the department of the city upon which would devolve the duty of their control, direction and administration upon the abolition of the commissioners. The warrant for a judicial annulment of a law upon the grounds of its unconstitutionality should be found in a clearly expressed prohibition or one necessarily implied. And a doubt should always resolve in favor of its constitutionality. To apply the constitutional prohibition to this act, is to extend it beyond reasonable limits and those of judicial determination. In Myers v. Com., 110 Pa. 224, it is said, in holding an act to be constitutional, "we see no merit as to the insufficiency of the title to this act. It authorized the reconstruction of county bridges destroyed or partially destroyed, and empowered the commissioners to borrow money for that purpose. The purpose of the act is sufficiently expressed in the title, and the authority to borrow money is germane to the reconstruction of bridges."

In Fredericks v. Penna. Canal Co., 109 Pa. 55, involving the constitutionality of " An act to authorize turnpike plank-road

and canal companies to issue bonds and secure the same by mortgage and to abandon portions of their roads and lines for public use," it is said: " The body of the act inter alia declares 'any such company may and is hereby authorized to abandon for public use such portions of their road or lines of improvement as may be deemed by such boards unnecessary to be kept open for public use, provided however at least two thirds of the stockholders approve and consent to the same.' The subject and the several parts thereof specified in the act are germane to the subject expressed in the title of the act. The title is not deceptive or misleading.   The subject is not disguised nor concealed thereby.   It is therefore sufficient."

I am of opinion that the act is constitutional.