## Philadelphia v. Spangler et al.

*Municipalities — Cities of the first class — Philadelphia — Resolutions — Ordinances—Act of June 25, 1919.*

1. The general rule that a resolution of a municipal council, as distinguished from an ordinance, does not require executive approval is not applicable to Philadelphia, since under the Charter Act of June 25, 1919, P. L. 581, both ordinance and resolution must be approved by the Mayor.

*Municipalities — Cities of the first class — Philadelphia — Ordinances— Streets—Act of June 6, 1871—Parkway—"Greber Plan."*

2. Councils of a city of the first class may change the line of a street, and such action is effective although the ordinance contains no direction or authority to the Board of Surveyors to record the change on the city plan, and although the board has not in fact taken any action to confirm the revision of the lines thus established, as provided by the Act of June 6, 1871, P. L. 1353.

3. Councils of the City of Philadelphia have never adopted the so-called "Greber Plan" for the improvement of the "Parkway" in that city, and that plan has no official status.

4. The fact that a lot of land is within the limits of the "Greber Plan" does not bring it within the bed of the "Parkway."

*Constitutional law—Special commissions—Local and special laws—Act of April 17, 1913 — Parkway — Boundaries — Exchange of lots—Title of ordinance—Estoppel—Deeds—Eminent domain.*

5. The Act of April 17, 1913, P. L. 93, vesting in the Park Commission of Philadelphia powers over parks and parkways, other than Fairmount Park, that may thereafter be committed to their care and management by Councils or individuals, is unconstitutional, in that it delegates to a special commission power to supervise and interfere with municipal property in violation of article iii, section 20, of the Constitution of 1874.

6. The Act of 1913 also violates article iii, section 9, of the Constitution, inasmuch as it applies only to the City of Philadelphia, and as no other city can ever in fact come within its provisions relating to the Park Commission, it is a local and special law relating to the affairs of cities.

7. The original legislation creating the Park Commission of Philadelphia and vesting powers in it is valid, since the acts were passed prior to the Constitution of 1874 and at a time when there was no constitutional prohibition as to the delegation of municipal powers to special commissions.

8. The Ordinance of the Councils of Philadelphia of May 20, 1915, enlarging Logan Square in that city and placing that square and several squares and the Parkway under the care and management of the Commissioners of Fairmount Park, is invalid, as it violates the provisions of the Act of May 23, 1874, P. L. 230, by containing more than one subject.

9. The Parkway has never validly been brought under the care and management of the Commissioners of Fairmount Park.

10. The Parkway may be brought under the care and management of the Park Commissioners by a proper ordinance under the Act of April 21, 1869, P. L. 1194, which authorizes the commissioners to accept the care and management of other grounds that may be appropriated to park purposes.

11. Under such an ordinance the commissioners would have only the right to "care" for such and "manage" the Parkway, inasmuch as they cannot, since the adoption of the Constitution of 1874, obtain any greater rights over it.

12. The right over the Parkway would not include the special powers given to the commissioners over Fairmount Park by the Acts of March 26, 1867, P. L. 547, April 14, 1868, P. L. 1083, and April 21, 1869, P. L. 1194, which powers the Act of April 17, 1913, P. L. 93, attempted to extend to certain city squares and the Parkway, such as the power to make exchanges of city lands within or abutting on the park in order to adjust boundaries, the power to vacate streets within the park, the power to license passenger railways therein, and the like.

13. The Commissioners of Fairmount Park have not the power with reference to the Parkway to adjust boundaries which they have with reference to Fairmount Park by virtue of section 2 of the Act of April 21, 1869, P. L. 1194.

14. Even if the commissioners had such power, they could not exercise it under the Act of April 21, 1869, P. L. 1194, by an exchange of lots where the owner of the lot sought to be acquired had no land abutting upon the Parkway; nor does the

Philadelphia *v.* Spangler et al.

power to "adjust boundaries" authorize an exchange of an entire city tract for the entire tract of an owner at some distant point, even though abutting on the Parkway.

15. The fact that the commissioners on several previous occasions had undertaken to adjust the boundaries of the park does not work an estoppel against the City, and this is especially so where the exchanges theretofore made were all for lands actually bounding Fairmount Park.

16. A municipality cannot be estopped from pleading *ultra vires* on the part or anybody purporting to act on its behalf.

17. The City is not estopped to object to an illegal exchange by the Commissioners of Fairmount Park of a city lot for other land by the fact that the Chief of the Bureau of City Property, who was *ex officio* one of the commissioners, attended the meeting of the commission at which the exchange was approved, and voted in favor of the exchange.

18. An exchange of a city lot for another lot by the commissioners is an abuse of discretion, where it appears that there was a great disparity in the market value of the two lots to the disadvantage of the City, and this is so although the commissioners acted in good faith and in the belief that the lot which they were conveying was subject to greater building restrictions than in fact existed and was, therefore, less in value.

19. The commissioners were without authority to place a building restriction on a city tract which they were conveying, even if they had authority to convey the tract at all.

20. The Ordinance of March 21, 1917 (page 81), placing certain restrictions upon buildings any portion of which may come within the boundary lines of the Parkway or within 200 feet therefrom, does not restrict the maximum height of a building erected on the Parkway east of Eighteenth Street to 80 feet, but only to 200 feet as to its main cornice-line and 245 feet as to any portion of it.

21. If the Park Commissioners have authority to convey a city tract, the deed making the conveyance need not be signed by the Mayor; it is sufficient that it be executed by the commissioners on behalf of the City and acknowledged by an attorney appointed for that purpose.

22. Where the Park Commissioners have the legal authority to condemn land, they may invest a committee of their own members with authority to effect the condemnation.

23. Such condemnation is not rendered invalid because it is employed in order to facilitate the carrying out by an individual of a contract on his part to purchase the land and convey it to the City, or to reimburse the City for such sums as the City may be obliged to expend for it in such condemnation proceedings.

24. The Park Commissioners have no authority to condemn land where there exists no balance of any appropriation previously made by Council sufficient to pay the awards therefor.

25. The Park Commissioners have no power to condemn land which does not adjoin a public park, and even as to such adjoining land the power granted to them by the Acts of April 24, 1903, P. L. 294, and May 28, 1915, P. L. 578, is invalid, because those acts are subject to the same objections as to constitutionality as the Act of April 17, 1913, P. L. 93.

Bill in equity to cancel deeds. C. P. No. 2, Phila. Co., Dec. T., 1926, No. 17442.

*Jos. P. Gaffney,* City Solicitor, and *Glenn C. Mead,* Assistant City Solicitor, for plaintiff.

*George Wharton Pepper,* for Park Commission, and *John Hampton Barnes,* for The Philadelphia Club, defendants.

STERN, J., Oct. 14, 1927.—This is a proceeding in equity for the cancellation of certain deeds purporting to exchange land owned by the City of Philadelphia with land owned by the defendant Evan M. Spangler, and for a decree declaring said deeds to be void.

On bill, answers and proofs the court makes the following

### Findings of fact.

1. By Ordinance of Councils of the City of Philadelphia of April 12, 1892 (page 211), the Department of Public Works was authorized to place on the City plan the Park Boulevard of the width of 160 feet, extending from City Hall to Fairmount Park, with certain boundaries provided in said ordinance.

2. By Ordinance of Dec. 14, 1894 (page 453), the Department of Public Works was authorized to strike this Park Boulevard from the City plan; but

by Ordinance of March 28, 1903 (page 53), the Board of Surveyors was authorized to place on the City plan an avenue or parkway between City Hall and Fairmount Park, with certain boundaries provided in said ordinance.

3. By Ordinance of June 1, 1909 (page 153), the Mayor, City Solicitor and City Controller were authorized to negotiate with owners of property within the lines of the Parkway or within 200 feet thereof, and upon reaching an agreement as to the price, and the title proving satisfactory, to take title thereto in the name of the City of Philadelphia, the purchase money to be taken from funds appropriated to the Department of the City Treasurer for Parkway purposes; and a similar Ordinance of Dec. 9, 1909 (page 314), authorized the continuance of such negotiations and the purchase of properties out of additional funds which meanwhile had been appropriated for Parkway purposes.

4. Partly by purchase under the provisions of these ordinances and partly by independent condemnation proceedings for Parkway purposes, the City of Philadelphia obtained a fee simple title to four properties—one from Archbishop Ryan, under date of Dec. 11, 1909; one from Walter E. Hering and wife, under date of May 20, 1916; one from Fidelity Trust Company, substituted trustee, under date of July 21, 1916; and one from Girard Trust Company, trustee, under date of Nov. 3, 1917. They were situated on the southeast corner of Eighteenth and Race Streets and extended southerly on Eighteenth Street and easterly on Race Street.

5. By Ordinances of June 27, 1904 (page 143), Jan. 4, 1906 (page 1), and June 8, 1909 (page 161), the Board of Surveyors was authorized and directed to revise the lines of the Parkway in accordance with the changes specified in said ordinance. The lines established by the Ordinance of June 8, 1909, were confirmed by the Board of Surveyors and placed on the City plan on Sept. 20, 1909, and the lines thus established, subject to certain minor modifications not affecting the present case, and to changes made by two resolutions of Council hereinafter mentioned, remain as the lines of the Parkway as at present authorized by Council and laid out on the City plan.

6. With reference to the Parkway line, under the Ordinance of June 8, 1909, confirmed Sept. 20, 1909, hereinabove referred to, more than half of the area of the four properties above mentioned was within the bed of the Parkway. Part of the said four properties constitutes one of the two tracts of land involved in the present cause. This tract, hereinafter referred to as Tract A, is situate on the south side of Race Street, beginning at a point 158 feet 3 inches west of Seventeenth Street, thence extending southward on a line parallel with Seventeenth Street 117 feet 11½ inches to the northeast side of the Parkway, thence northwestward along the same 138 feet 6¼ inches to a point, thence northeastward 41 feet 1½ inches to the south side of Race Street, and thence eastward along the same 102 feet 5¼ inches to the place of beginning, and containing 8761.4 square feet, of which 452.4 square feet at the westerly end of the tract were within the bed of the Parkway, and the remainder outside but abutting on it.

7. On Jan. 3, 1920, the Mayor of Philadelphia approved and signed a resolution of the Council of Philadelphia (Ordinances, page 33), which provided, *inter alia*, that the tract of land on the south side of Race Street "about seventy-one feet three inches east of Eighteenth Street, containing about ninety-seven feet six inches in front on Race Street," is "hereby included within the limits of the Parkway." This description covered some of the land which had already been included in the lines of the Parkway by the Ordinance of June 8, 1909, hereinbefore mentioned, and also an additional portion of Tract A.

8. On Oct. 26, 1926, the Mayor approved and signed a resolution of the Council of Philadelphia (Ordinances, page 593) which amended the resolution of Jan. 3, 1920, by striking out the word "seventy-one" and inserting in lieu thereof the words "one hundred and thirty-nine." The effect of this resolution was to place in the Parkway the entire Tract A.

9. No action by way of change or revision of the lines of the Parkway on the City plan has at any time been taken by the Board of Surveyors under or in pursuance of the said resolutions of Council of Jan. 3, 1920, and Oct. 26, 1926, nor did said resolutions authorize or direct the Board of Surveyors to make any such change or revision with reference to the lines of the Parkway.

10. By Ordinance of May 20, 1915 (page 185), entitled "An ordinance to enlarge Logan Square and to place said square and other grounds under the care and management of the Commissioners of Fairmount Park," it was provided: "That all the land between the western boundary of Logan Square and Twentieth Street from Race Street to the Parkway is hereby appropriated for public park purposes as an addition to Logan Square, and the grounds within the boundaries of said enlarged square, Rittenhouse Square, Washington Square, Independence Square, Franklin Square and the Parkway, now and hereafter acquired by the City, are hereby placed under the care and management of the Commissioners of Fairmount Park. . . ."

11. In pursuance of said Ordinance of May 20, 1915, and the Act of April 17, 1913, P. L. 93, the Commissioners of Fairmount Park assumed the care and management of Tract A and retained the same until the execution by them of the deed to the defendant, Evan M. Spangler, hereinafter mentioned, dated Jan. 12, 1927.

12. The defendant, The Philadelphia Club, is a corporation of the State of Pennsylvania, owning and occupying a club-house property situated at the northwest corner of Thirteenth and Walnut Streets. With a view of purchasing a new site, the club, through its president, in December, 1925, appointed a committee to select such a site. This committee consisted of Messrs. Isaac W. Roberts, Benjamin Chew and Eli Kirk Price. Mr. Price at that time was, long has been, and still is, one of the commissioners of Fairmount Park, Vice-President of said commissioners, and a member of the Commissioners' Committee on Land Purchases and Damages, which committee has charge of all questions involving the acquisition of property for park and Parkway purposes.

13. The said site committee of The Philadelphia Club employed the defendant Evan M. Spangler to act for the committee in the capacity of purchasing agent for any real estate which the committee might decide to purchase.

14. The said site committee of The Philadelphia Club inspected various properties, including Tract A. With regard to this latter property, Mr. Price told the other members of the committee that the commissioners might be willing to consider a trade if they could obtain for Tract A other ground which they considered desirable, and later Mr. Price informed the defendant Spangler that the property which the commissioners would desire in exchange was in the general neighborhood of Twenty-second, Vine and Wood Streets. Accordingly, the defendant Spangler commenced to purchase properties in the neighborhood of the northeast corner of Twenty-second and Vine Streets, and by December, 1926, had acquired title to nine such properties, consisting of Nos. 2127, 2129, 2131, 2133, 2135, 2137 Vine Street and Nos. 307, 311, 313 North Twenty-second Street. In making said purchases, Spangler acted under the direction and on behalf of the defendant B. Dawson Coleman, a member of The Philadelphia Club, who furnished the money for such pur-

chases; and as Spangler acquired title to each of these properties, he executed a declaration of trust in respect thereto in favor of Coleman.

15. On Dec. 8, 1926, the Commissioners of Fairmount Park, at a meeting duly held, and at which there was present the defendant Charles W. Neeld, who was Chief of Bureau of City Property and ex officio one of the commissioners, approved an exchange of Tract A for a tract on the north side of Vine Street beginning about 278 feet west of Twenty-first Street, containing about 117 feet in front and 120 feet in depth, and authorized and directed the officers of the commission to enter into an agreement for said exchange and to execute and deliver the necessary deeds, which deeds were to restrict the height of any building to be erected on Tract A to about eighty feet. The commissioners also resolved that if it should prove necessary to perfect the title to any portions of the lot to be conveyed to the City to exercise the power of eminent domain, the Park Solicitor was authorized and directed to take the necessary proceedings to assess the damages therefor under the direction of the Committee on Land Purchases and Damages, which was thereby given power to act for the commission.

16. The tract of land which the commissioners thus authorized to be accepted in exchange for Tract A was a tract on the northeast corner of Twenty-second and Vine Streets, of a frontage on Vine Street of 116 feet 11 inches, a depth or frontage on Twenty-second Street of 118 feet, and a depth on the easterly line thereof of 120 feet, and consisted of the nine properties the title to which had theretofore been acquired by the defendant Spangler as aforesaid, and, in addition thereto, the property No. 2139 Vine Street (constituting the northeast corner of Twenty-second and Vine Streets) and the property No. 309 North Twenty-second Street—eleven lots in all, containing 13,832.3 square feet. This tract, made up of said eleven properties, is hereinafter referred to as Tract B.

17. In pursuance of said action on the part of the commissioners, an agreement was entered into, under date of Dec. 9, 1926, between the Commissioners of Fairmount Park and Evan M. Spangler, wherein and whereby, for the alleged purpose of adjusting the boundaries of the Parkway, the commissioners agreed, on behalf of the City of Philadelphia, to sell to Spangler Tract A, and Spangler agreed to sell to the City of Philadelphia for Parkway purposes Tract B. The respective titles were to be good and marketable, except that Tract A was to be subject to the building regulations provided for in the Ordinance of Councils of March 21, 1917 (page 81), as amended by the Ordinances of July 10, 1917 (page 317), and May 24, 1923 (page 174), hereinafter referred to; and to the further condition that without the previous written consent of the commissioners no portion of any building to be erected on said tract should exceed in height eighty feet above the street level of the Parkway. The agreement further provided that if Spangler, prior to the date of settlement (which was to be made within ninety days), should not have acquired title to premises Nos. 2139 Vine Street and 309 North Twenty-second Street, the commissioners would proceed, on behalf of the City of Philadelphia, to acquire title thereto by condemnation upon being furnished with security by Spangler to ensure the payment to the commissioners of the amount of any damages that might be awarded for said condemnation; and final settlement was to be made at the expiration of said ninety days as though the title to all of the lots included within said Tract B was then vested in Spangler.

18. On Dec. 9, 1926, the date of said agreement, Spangler assigned all his right, title and interest therein to Coleman, and on the same day Coleman

entered into an agreement with The Philadelphia Club granting to it an exclusive option to purchase all his right, title and interest in said agreement, the consideration to be paid to Coleman upon the exercise of said option being the entire cost to him of all of the properties which he should then have acquired and which were to be conveyed under said agreement to the commissioners. On Jan. 12, 1927, a special meeting of the members of The Philadelphia Club was held, at which the board of directors was authorized to purchase Tract A and to make contracts for the erection of a club-house thereon.

19. On Jan. 18, 1927, settlement was made under the agreement between the commissioners and Spangler. By deed executed and delivered on said date, but dated Jan. 12, 1927, "the City of Philadelphia, acting herein by the Commissioners of Fairmount Park" "for the purpose of adjusting the boundaries of the Parkway," conveyed Tract A to Spangler in fee simple, under and subject to the building regulations provided in certain ordinances of Councils as stipulated in the agreement of exchange, and to the further condition that without the previous written consent of the commissioners no portion of any building thereafter erected on said tract should exceed in height eighty feet above the street level of the Parkway. The deed was signed "The City of Philadelphia, by Commissioners of Fairmount Park," and was acknowledged by one Charles Adams, who was appointed in the deed as attorney for the grantor for it and in its name to make such acknowledgment. By deed also executed and delivered on Jan. 18, 1927, but dated Jan. 12, 1927, Spangler and his wife conveyed to the City of Philadelphia, "for the purpose of adjusting the boundaries of the Parkway," the nine lots of ground which he had theretofore acquired as part of the eleven lots constituting Tract B. The conveyance was made "for the uses and purposes of the Parkway and for no other use or purpose whatever with the same effect as if the said land had been included within the original boundaries of said Parkway."

20. In the said deed from the City of Philadelphia by the Commissioners of Fairmount Park to Spangler, the consideration was stated to be the conveyance by Spangler to the City of Philadelphia "of a certain lot of ground beginning at a point on the north side of Vine Street at the distance of 278 feet 8 inches, more or less, west of Twenty-first Street, bounding on other ground acquired by the said City of Philadelphia for Parkway purposes." Said description is incorrect, in that no part of the ground conveyed by Spangler by his deed of Jan. 12, 1927, bounded either on the Parkway or on any other ground acquired by the City of Philadelphia for Parkway purposes. The nearest point of said land of Spangler is about 135 to 140 feet from the nearest point of the Parkway as fixed by ordinances of Councils and laid out on the city plan as aforesaid, and Spangler did not own any land abutting or bounding on the Parkway. It is true that three days after he deeded said nine lots to the City of Philadelphia, condemnation proceedings were started, as hereinafter stated, to acquire premises No. 2139 Vine Street, but said lot, No. 2139 Vine Street, does not itself constitute part of the Parkway, nor does it abut thereon. There is a similar misdescription in the deed from Spangler to the City of Philadelphia in describing the said nine lots as extending "to a point in the line of land of the said grantee" (the City of Philadelphia).

21. Coleman having given to the commissioners the bond of indemnity provided for in the said agreement of Dec. 9, 1926, the Committee on Land Purchases and Damages of the Commissioners of Fairmount Park, at a meeting held on Jan. 21, 1927, and in pursuance of the authority given to said committee by the commissioners at their meeting of Dec. 8, 1926, as aforesaid, appropriated for public park purposes the property No. 2139 Vine Street

Philadelphia v. Spangler et al.

(northeast corner Twenty-second and Vine Streets), which the committee in its resolutions described as "adjoining a public park known as the Parkway," and authorized and directed the Park Solicitor to take the necessary steps for the assessment of damages. In fact, the said property No. 2139 Vine Street did not then or at any time adjoin the Parkway.

22. In pursuance of said resolutions adopted by the Committee on Land Purchases and Damages, the Commissioners of Fairmount Park filed a petition in Court of Common Pleas No. 4, as of December Term, 1926, No. 15987, for the appointment of a board of view, and on June 4, 1927, the said court appointed a board of view to assess the damages caused by the appropriation of said lot at the northeast corner of Twenty-second and Vine Streets, and said condemnation proceedings are now pending.

23. At the time the Committee on Land Purchases and Damages appropriated said lot, to wit, Jan. 21, 1927, as aforesaid, and on June 4, 1927, when a board of view was appointed as aforesaid, there was outstanding an unexpended balance of only $877,493.77 of appropriations made by Council to the commissioners for acquisition, condemnation and purchase of property for park and Parkway purposes, and at those times there were pending other condemnation proceedings before boards of view previously appointed on the petitions of the commissioners to condemn for park purposes other lands not involved in the present controversy, including lands on the west side of Twenty-first Street south of Vine Street, extending down to Summer Street, and in which latter proceedings the board of view had reported awards of damages of approximately $1,811,384.

24. By agreement dated Jan. 21, 1927, the defendant Spangler purchased from the owner thereof the premises No. 309 North Twenty-second Street, and the title to said property was deeded by him to the City of Philadelphia some time in February, 1927. The purchase money for this property was originally paid to the owner by the commissioners, but was refunded to them by Spangler. Therefore, of the eleven lots which he had agreed to convey to the City as constituting Tract B, the City has now acquired title to ten and the eleventh is the lot at the northeast corner of Twenty-second and Vine Streets which has been condemned by the commissioners, as above stated.

25. By Ordinance of March 21, 1917 (page 81), it was provided that "No building, any portion of which may come within the boundary-lines of the Parkway, between Broad Street and Eighteenth Street, or within 200 feet therefrom, shall hereafter be erected, altered or used, except in conformity with the following regulations: 1. The main cornice-line of every such building, except a church, fronting on or facing toward the Parkway, shall not exceed in height above the street level three times the width of its facade fronting on or visible from any point within the boundaries of the Parkway, or, in any event, 200 feet, and no other portion of said building, except pediment or attic wall, shall exceed the height of said cornice, unless the portion or portions above said cornice-line shall recede from the plane of each facade of said building at least as far as said portion or portions extend above said line. No portion of said building, except a church, shall in any case exceed 245 feet in height above the street level." (There are other regulations not particularly relevant to the present cause.)

Said ordinance further provided that "No building, any portion of which may come within the boundary-lines of the Parkway or Logan Square, between Fairmount Park and Eighteenth Street, or within 200 feet therefrom, shall hereafter be erected, altered or used, except in conformity with the following regulations: 1. The main cornice-line of every such building,

except a church, shall not exceed in height above the street level the width of its facade fronting on the Parkway Drive or facing toward the Parkway or Square, or, in any event eighty feet, and no other portion of said building, except pediment or attic wall, shall exceed the height of said cornice, unless the portion or portions above said cornice-line shall recede from the plane of each facade of said building at least as far as said portion or portions extend above said line. No portion of such building, except a church, shall in any case exceed 100 feet in height between Fairmount Park and the Crescent, or 160 feet in height between the Crescent and Eighteenth Street." (There are other regulations not particularly relevant to the present cause.)

26. The fair market value in December, 1926, and January, 1927, of Tract A was $350,450, assuming that the owner thereof could lawfully erect buildings thereon to a height above the street level of 245 feet. If, however, the owner could lawfully erect buildings on said lot only to a height not exceeding eighty feet, the fair market value of Tract A at said times was $262,850.

27. The fair market value in December, 1926, and January, 1927, of Tract B was $221,300, said valuation being based on a fee simple title. A title limited to "the uses and purposes of the Parkway, and for no other use or purpose whatever, with the same effect as if the said land had been included within the original boundaries of said Parkway," had no market value whatever, since it could not be conveyed by the City and could remain only for Parkway uses. The fair market value in December, 1926, and January, 1927, of Tract B, exclusive of the lot No. 2139 Vine Street (northeast corner of Twenty-second and Vine Streets), was $180,800. At said times the fair market value of the lot No. 2139 Vine Street was $20,000. (The fair market value of Tract B as an entirety is greater than that of the sum of the fair market values of lot No. 2139 Vine Street as a separate lot and the remaining ten properties of said tract.)

28. Neither the Mayor or other officials, nor the Council of Philadelphia authorized the transaction involved in the present cause. Neither did they nor any of them authorize the Commissioners of Fairmount Park to enter into the agreement of Dec. 9, 1926, or into any agreement with respect to the exchange of Tracts A and B, or to execute a deed of conveyance of Tract A.

29. In the early part of the year 1917 one Jacques Greber, a French landscape engineer, was employed by the Commissioners of Fairmount Park to make drawings and studies with reference to the Parkway. (Part of the fee for his services was paid by the Department of Public Works.) Greber prepared a comprehensive plan covering the entire area, but the boundary-lines of the Parkway and park development suggested by him have never been adopted, approved or referred to by any ordinance of Council or by any act of the Mayor or other officials of the City of Philadelphia, or placed upon the city plan. The so-called "Greber Plan" exists, therefore, only as a suggestion for future possible development and extension of the Parkway, and no official authority has been accorded to it.

30. From time to time ordinances have been passed by Council appropriating, for "park purposes" or for "park and parkway purposes," lots or tracts of ground outside of the limits of the Parkway as defined by the Ordinance of June 8, 1909, but within the limits of the Parkway and park development as shown on the so-called "Greber Plan." The Commissioners of Fairmount Park have also condemned land for park purposes outside the limits of the so-called "Greber Plan."

Philadelphia v. Spangler et al.

31. Tract B is situated within, and Tract A is situated without, the limits of the Parkway and park development as shown on the so-called "Greber Plan."

32. Upon six previous occasions, during the years from 1888 to 1917, the Commissioners of Fairmount Park made exchanges of land on behalf of the City of Philadelphia purporting to be in pursuance of the authority given to the commissioners by the Act of April 21, 1869, P. L. 1194. In all said cases exchanges of park properties were made with owners whose properties bounded on the park.

## Discussion.

Before undertaking to discuss the provisions of the statutory law of the State with reference to the extent of the power of the Commissioners of Fairmount Park to make an exchange of deeds such as that involved in the present cause, it is desirable to determine the status of the two tracts of land which were the subject of the exchange respecting their position with reference to the legal lines of the Parkway.

*At the time of the exchange, was the property deeded by the commissioners to Spangler, referred to in the findings of fact as Tract A, a part of the Parkway?*

The answer to this question depends on the validity and legal effect of the resolutions of Council of Jan. 3, 1920 (page 33), and Oct. 26, 1926 (page 593). These resolutions placed the entire tract within the Parkway lines, but it is contended by the City of Philadelphia, plaintiff, that they were ineffective for that purpose because resolutions are orders of Councils merely of a special and temporary character, while ordinances prescribe permanent rules of conduct or government, and that, therefore, the action sought to be taken by Council should have been by ordinance rather than by resolutions. This distinction, however, seems to be unimportant in view of the fact that, generally speaking, the only requirement in regard to the passage of an ordinance as distinguished from a resolution is that the former requires the concurrence of the executive head of the municipal government, whereas a resolution does not require executive approval, but this difference does not exist in municipal legislation in Philadelphia, for, under the Charter Act of June 25, 1919, art. XVI, § 6, P. L. 581, "every legislative act of the Council shall be by ordinance or resolution, and every ordinance or resolution shall, before it takes effect, be presented, duly engrossed and certified, to the Mayor for his approval. The Mayor shall sign such ordinance or resolution if he approves it, whereupon it shall become law." As a matter of fact, the Mayor approved and signed the two resolutions in question.

It is further contended by the plaintiff that these resolutions of Council did not authorize or direct the Board of Surveyors to revise the lines of the Parkway on the city plan so as to include the new area thus embodied in it, and that the only lawful way to make a change in the limits of the Parkway is by the Board of Surveyors confirming any revision made by Council. It is true that by the Act of June 6, 1871, § 1, P. L. 1353, the Board of Surveyors of the City of Philadelphia are invested with full authority to examine and finally confirm or reject all plans of surveys or revisions of plans of the City of Philadelphia when the same have been made by direction of the Select and Common Councils of the City; and section 3 of said act provides that no street shall be added to any confirmed plan of the city and called a public street until the same shall have been approved by the Board of Surveyors as to location, width and grades. It is not believed, however, that the power thus given

to the Board of Surveyors is legislative in its nature, or that a change made by Council in the line of a street is ineffective unless it receives the approval of the Board of Surveyors. On the contrary, it is thought that the duty of the board is to keep the city plan, which is a public map or chart useful as a guide or record, but serving as evidence of the facts therein portrayed rather than itself constituting the final and authoritative location of the city streets. The mere general designation by Council of a change of lines usually requires, as a practical matter, a more detailed survey and revision as to location, width and grades, and this work it is the function of the Board of Surveyors to perform; but, as stated by Mitchell, J., in Wetherill v. Pennsylvania R. R. Co., 195 Pa. 156 (1900): "This act (that of June 6, 1871, P. L. 1353) vested the authority in councils. Under their direction the Department of Public Works acts as the executive branch of the municipality to see that the legislative intent is properly carried out. It does not appear that the department has any independent discretion should it happen to differ with councils on the wisdom or policy of the latter's directions."

We, therefore, conclude that the Resolutions of Council of Jan. 3, 1920, and Oct. 26, 1926, were effective to bring Tract A within the limits of the Parkway, even though they contained no direction or authority to the Board of Surveyors to record the changes upon the city plan, and even though the Board of Surveyors have not in fact taken any action to "confirm" the revision of lines thus established.

*At the time of the exchange, was the property deeded by Spangler to the Commissioners of Fairmount Park, referred to in the findings of fact as Tract B, a part of the Parkway, or did it bound upon the Parkway?*

As far as any ordinances of Council or acts of any authorized official of the City of Philadelphia are concerned, this question may promptly be answered in the negative. The line of the Parkway as established by municipal legislation and laid out on the city plan is, subject to minor modifications not involved in the present cause, that established by the Ordinance of June 8, 1909 (page 161), confirmed by the Board of Surveyors under date of Sept. 20, 1909. According to that line, Tract B is not within the Parkway, does not abut upon it and is distant from it at its nearest point from 135 to 140 feet. It is contended, however, by the defendants that it falls within the Parkway as laid out on the so-called "Greber Plan." This is true in fact, but, as stated in the findings of fact, the "Greber Plan" has no official authority as its basis. It represents merely a suggestion by a distinguished French engineer and landscape gardener as to what would be a desirable development of the Parkway. No ordinance of Council has referred to or recognized it. It is true that Council has in some instances appropriated land "for park and parkway purposes" outside of the official limits of the Parkway but within the limits of the "Greber Plan;" but it is likewise true that Council has also appropriated property for Parkway purposes even outside of the boundaries established by the "Greber Plan." Indeed, the very Tract A involved in the present cause, and which the commissioners deeded to Spangler on the theory that it was situated outside of the "Greber Plan," and, therefore, was an undesirable and unnecessary holding, was placed within the Parkway lines by Council by the Resolution of Oct. 26, 1926, above referred to, only six weeks before the commissioners, by their agreement of Dec. 9, 1926, contracted to deed it away again to Spangler. It cannot be said, therefore, that Council has shown any definite tendency to observe the Greber lines. Be this as it may, however, it cannot be successfully contended that the boundaries of the Parkway are

other than as authorized and determined by the legislative body of the City and approved by the executive. It is obvious, therefore, that Tract B, for which the commissioners exchanged Tract A, was neither part of the Parkway nor bounding upon it, but, on the contrary, was, with reference to the Parkway, an isolated and wholly separated tract of land.

Having thus determined the location, with respect to the Parkway, of the two tracts which were exchanged by Spangler and the commissioners, we now proceed to consider the extent to which the commissioners have power over the Parkway.

By the Acts of March 26, 1867, P. L. 547, April 14, 1868, P. L. 1083, and April 21, 1869, P. L. 1194, the commissioners were given certain powers over Fairmount Park, and by the Act of May 15, 1871, P. L. 873, similar powers over Hunting Park. The commissioners claim that by the Act of April 17, 1913, P. L. 93, and the Ordinance of May 20, 1915 (page 185), these powers over Fairmount Park and Hunting Park were extended to certain other parks or squares in the City of Philadelphia and to the Parkway. The plaintiff, the City of Philadelphia, contends, on the other hand, that this Act of April 17, 1913, and this Ordinance of May 20, 1915, are unconstitutional, and, therefore, that the powers of the commissioners over Fairmount Park have not been legally extended to the Parkway. We are thus met with the question:

### Is the Act of April 17, 1913, P. L. 93, constitutional?

The Act of April 17, 1913, P. L. 93, provides: "That the commissioners of public parks in cities of the first class shall have all the powers and control over parks, parkways and other grounds now or hereafter committed to their care and management by the councils of said cities, or by individuals, which they now have or may hereafter acquire, over public parks placed in their charge by any general or special law of this Commonwealth."

The validity of the act is attacked on the ground that it violates article III, section 20, and also article III, section 7, of the Constitution of the State.

Article III, section 20, of the Constitution provides that: "The general assembly shall not delegate to any special commission, private corporation or association any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

That the Commissioners of Fairmount Park constitute a special commission can scarcely be questioned. The Act of March 26, 1867, P. L. 547, creating the commission, provided that it should consist of the Mayor, the Presidents of the Select and Common Councils, Commissioner of City Property, the Chief Engineer and Surveyor and the Chief Engineer of the Water Works of the City of Philadelphia, together with ten citizens to be appointed, five by the District Court and five by the Court of Common Pleas (all the members other than those holding ex officio are now appointed by the Courts of Common Pleas). To this commission thus constituted was not only entrusted a municipal function, namely, the control and management of Fairmount Park, which is municipal property and the title to which is held by the City of Philadelphia, but a power thereover which, as construed by numerous decisions of the courts, is exclusive and totally independent of the municipal government.

Thus, in Philadelphia v. McManes, 175 Pa. 28 (1896), it was said by Thayer, P. J., in an opinion affirmed by the Supreme Court per curiam, that: "Whoever w'll read attentively the four acts of assembly organizing Fairmount Park and regulating its affairs and government—the Acts of 1867,

1868, 1869 and 1870 — will have no difficulty in perceiving that while the largest powers are granted by the legislature to the commissioners designated by the State to govern and control it, the city councils are carefully excluded from all participation in the control of its affairs." And again: "The Act of 1867 committed the entire and exclusive control and maintenance of the park to the commissioners, and while placing the City Councils under obligations to make the necessary appropriations for its maintenance, excluded them from all power over the plans and expenditures, carefully requiring, in the most explicit terms, that all such plans and expenditures should be under the control of the commissioners." And again: "It (the Act of April 14, 1868) gave to the commissioners the exclusive appointment of all park officers and agents, with the exclusive right to prescribe their several duties and the compensation to be paid to them. It gave them further complete control of all houses and buildings in the park. It established a code of regulations for the park, and gave the commissioners power to add to them from time to time at their discretion, and . . . it expressly gave the commissioners power 'to construct all proper bridges, buildings, railways and other improvements therein.' " And again: "In all this large grant of powers, the only power given to the city councils was a power which they already possessed, viz., the power to widen and straighten any street for the purpose of improving the approaches to the park. All other powers were scrupulously and studiously withheld from them by the State. If they have at any time exercised any such powers through the control which the law gives them over appropriations or otherwise, it is a usurpation of authority unwarranted by law and against which the courts of justice would be obliged to enjoin them peremptorily if relief against it were sought there." And again: "The commissioners derive their authority from a higher source than the city councils. They were not created by them, are not their agents in any sense, and are not in any way subject to their authority or control. They were appointed under the authority of the State, which has confided to them, and to them alone, the control and management of the park, which they are to govern and manage alone, without any interference on the part of councils." And again: "It thus appears that the entire and exclusive control of the park, its grounds, its works, its maintenance, its improvements, its expenditures, its business, its officers and employees, together with every function of government relating to the subject, has been confided by the legislature to the park commissioners, consisting of sixteen persons, of whom six are official representatives of the interests of the City and ten are reputable citizens of Philadelphia, appointed under the authority of the State by the judges of the Courts of Common Pleas. It further appears that, beyond a doubt, this body has express authority to grant the license complained of in this case, and that such grant of authority is not obnoxious to any constitutional objection, and, further, that by the very terms of the grant it is in no manner whatever dependent upon the will of the city councils, nor have the latter any voice or authority whatever to intermeddle in the matter."

In that case, it was held that the commissioners had the power to grant to an individual a franchise to construct a passenger railway in Fairmount Park and that such franchise could be exercised without the consent of the city councils.

In Wakelin v. Philadelphia, 21 Dist. R. 39 (1911), it was held that neither Councils and the Mayor nor any other officers of the City of Philadelphia had power to make a contract for the erection of a building in Fairmount Park, but that such power was exclusively in the Commissioners of the Park—a

power which could not be taken away from them, neither could they relinquish it.

In Wood v. Philadelphia, 59 Pa. Superior Ct. 90 (1915), it was held that the Commissioners of Fairmount Park had full authority to appoint members of the park guard without respect to the civil service laws, and that neither the commissioners nor their employees were city employees.

It will thus be readily seen that the Commissioners of Fairmount Park form in no sense a part of the governing body of the City of Philadelphia. Their *personnel* is determined by the act of the legislature as far as the *ex officio* members are concerned, and the other members are chosen by the county judges, who are State and not municipal officers. The commissioners are in no way amenable to control by the councils nor by the executive departments of the City of Philadelphia. They constitute, therefore, as typical an instance as can be conceived, of a special, extra-municipal commission performing a municipal function, namely, the control and management of Fairmount Park, which is the property of the City of Philadelphia, and the control, managing and policing of which would, therefore, ordinarily be the right and the duty of the municipal authorities. Indeed, this is all conceded by the defendants, for in their ninth request for conclusions of law they ask the court to find that "the entire and exclusive control of the park, its grounds, maintenance and improvements, together with every function of government relating to the subject, has been confided to the Commissioners of Fairmount Park."

This being so, the Act of April 17, 1913, clearly was an attempt to delegate to this commission additional powers of supervising municipal improvements and property, for it gave them the power therein stipulated over all grounds that might thereafter be committed to their care by city councils and indeed even by individuals. The original acts granting the same powers over Fairmount Park were, of course, entirely valid, because they antedated the Constitution of 1874, but the Act of 1913 is in a different position because of the intervening constitutional provision. It was a clear delegation of power in the very teeth of article III, section 20, of the Constitution.

In Perkins v. Philadelphia, 156 Pa. 554 (1893), it was held that the Act of May 24, 1893, P. L. 124, placing certain public buildings under the control of the department of public works in cities of the first class, was unconstitutional. This was not as strong a case as the present one for invoking the constitutional inhibition, because the department of public works is at least a department of the city government, whereas, as above pointed out, the Commissioners of Fairmount Park are in no way connected with or controlled by the municipal government.

In Porter v. Shields, 200 Pa. 241 (1901), it was held that the Act of April 11, 1899, P. L. 36, was a violation of article III, section 20, of the Constitution, in that it committed to a board of "sidepath commissioners," therein established, the construction and maintenance of sidepaths along the highways in the townships of the Commonwealth.

In Moll v. Morrow, 253 Pa. 442 (1916), it was held that the Act of June 27, 1913, P. L. 638, providing for the creation of the "bureau of public morals" in the department of public safety in cities of the second class, was unconstitutional, as delegating municipal functions to a special commission in violation of article III, section 20, of the Constitution. It was pointed out that the "bureau" was not to be a department subordinate to the mayor, in whom was vested the executive power of the city, but was a special agency for the performance of a municipal function, and as such was within the ban of the constitutional provision.

In Junge's Appeal, 6 Adv. Reps. 125, Superior Ct. (1927), the court sustained the constitutionality of the Act of May 1, 1923, P. L. 122, which empowered the mayor, with the approval of the council, to appoint a board of appeals in certain cases relating to zoning regulations, but the opinion of the court so deciding was based expressly upon the distinguishing ground that the board of appeals was to be a body created by the city (appointed by the mayor and confirmed by council pursuant to an ordinance of the city) as an arm or bureau of the city government.

All these cases, and others that might be cited, are clearly to the effect that, since the Constitution of 1874, the legislature cannot delegate new and additional powers of performing municipal functions to commissions not appointed by the city authorities and not under their control. It must be remembered that the Constitution does not concern itself with the creation of special commissions, but with the delegation of power to such commissions. The fact, therefore, that the Commissioners of Fairmount Park antedated the Constitution of 1874 is of no importance. The question is whether powers were delegated to them since the Constitution, and certainly the Act of April 17, 1913, did attempt greatly to enlarge their powers by extending the exercise of them over additional large territory.

We, therefore, have no difficulty in concluding that, while, as above stated, the Fairmount Park Commission was legally established by the Act of 1867, and while, by that act and those of 1868, 1869 and 1871, it has all the powers therein given with respect to Fairmount Park and Hunting Park, any attempted delegation and extension of these powers to other parks and parkways of the City of Philadelphia by legislation subsequent to the adoption of the Constitution are unconstitutional and, therefore, void. Indeed, if it were otherwise, the legislature could, notwithstanding the Constitution, place within the control of this special commission unlimited additional areas of city land. Neither, of course, does it make any difference that the Act of April 17, 1913, vests these powers in the commissioners only over such lands as might thereafter be committed to them by the City Councils and by individuals. The enabling grant of power is by the act itself; this grant and the designation by Council of the additional lands to which it should be applicable cannot, in combination, vest in a special commission the power to perform municipal functions independently of municipal control, and, therefore, in violation of the Constitution.

We are of opinion, further, that the Act of April 17, 1913, is invalid also as involving a violation of article III, section 7, of the Constitution, which provides that "The general assembly shall not pass any local or special law . . . regulating the affairs of counties, cities, townships, wards, boroughs or school districts." If it be true that park commissions endowed with any grant of power cannot now be established by the legislature, nor added powers delegated to any now existing, it is clear that, even though the Act of 1913 provides generally for "commissioners of public parks in cities of the first class," this phraseology does not avoid the special and local nature of the act. There is now only one city of the first class, and no city that hereafter may come into that class can have special "commissioners of public parks" as established for Philadelphia by the Act of March 26, 1867. Therefore, the case of Perkins v. Philadelphia, 156 Pa. 554 (1893), is directly apposite, since in that case also the act there under consideration was held unconstitutional because it applied to but one particular city, and from the very nature of the situation there could never be another city that might come into the first class to which it could apply.

We are not unaware of the fact that in the case of Pennsylvania Mutual Life Insurance Co. v. Cuyler, 283 Pa. 422 (1925), the Act of April 17, 1913 (as well as the Ordinance of May 20, 1915), were referred to by the Supreme Court, but no question as to their constitutionality was raised or discussed, and, therefore, of course, that case is no authority upon the present question, which is now for the first time presented for judicial consideration.

*Is the Ordinance of May 20, 1915 (page 185), valid?*

By this ordinance the Councils of Philadelphia attempted to place under the care and management of the Commissioners of Fairmount Park certain of the public squares of the City and also the Parkway, under the authority given by the Act of April 17, 1913, which has just been discussed. The plaintiff, however, attacks the validity of this ordinance on the ground that it violates the Act of May 23, 1874, § 3, P. L. 230 (a similar provision is contained in the City Charter of June 25, 1919, art. XVI, § 6, P. L. 581), which provides that no bill (referring to ordinances) shall be passed containing more than one subject, which shall be clearly expressed in its title. The title of the ordinance, which is "To enlarge Logan Square and to place said square and other grounds under the care and management of the Commissioners of Fairfount Park," sufficiently and comprehensively expresses the content of the ordinance, but it would seem that the ordinance does violate the act referred to, in that it contains more than one subject. It first appropriates for public park purposes certain land between the western boundary of Logan Square and Twentieth Street, from Race Street to the Parkway, and then it places under the care and management of the Commissioners of Fairmount Park Logan Square, thus enlarged, together with Rittenhouse Square, Washington Square, Independence Square, Franklin Square and the Parkway. It would seem clearly obvious that the ordinance contains two distinct subjects of legislation, namely, the appropriation of a specific piece of ground, and then the placing of several squares and the Parkway under the control and management of the commissioners. The two subjects have nothing to do with one another, the one being a particular acquisition of specified property and the other being a general provision for the government of the squares of the City, and for these reasons we are of opinion that this ordinance is invalid as violating the statutory law of the State applicable thereto.

Holding, as we do, that the Ordinance of May 20, 1915, is invalid, it would follow that the Commissioners of Fairmount Park have no control or authority over the Parkway, and that would be an end of the present case. Even if, however, the Ordinance of May 20, 1915, were valid, and the Parkway was, therefore, legally committed by the City of Philadelphia, acting through Councils, to the care and management of the commissioners, what degree of authority did they thereby acquire? If the Act of April 17, 1913, is unconstitutional, as we have held, then the ordinance could not extend to the commissioners those powers which had been given to the commissioners over Fairmount Park by the Acts of 1867, 1868 and 1869. It could not give them, for example, the power to make exchanges of city lands within or abutting on the Parkway in order to adjust boundaries, or to vacate streets within its lines, or to license passenger railways to run upon it, all of which powers the commissioners do have with respect to Fairmount Park. All that could be given to them by the ordinance would be as authorized by section 6 of the Act of April 21, 1869, P. L. 1194, which provides that "it shall and may be lawful for the City Councils to confer upon said Park Commission, and for the

Philadelphia v. Spangler et al.

Commission to accept the care and management, from time to time, of any other grounds now appropriated or hereafter to be appropriated for park purposes within the City of Philadelphia." This provision was legal because it antedated the Constitution of 1874, but, at best, it authorizes the commissioners to accept merely "the care and management" of parks, and certainly the mere "care and management" would give to the commissioners the right only of ministerial management, of policing and supervision, and not the substantive and broad power of exchanging lands in order to adjust boundaries, which is involved in the present action, and which was the subject of a special grant in the case of Fairmount Park by the Act of 1869.

Assuming, however, that the commissioners had all the powers over the Parkway that they enjoy over Fairmount Park, there would arise the question as to whether, even under such powers, they would have the authority to make the exchange of deeds with Spangler as they attempted to do, and in order that every phase of the matter shall be upon the record for purposes of appellate review, we proceed to a discussion of that subject. It may be stated, at the outset, that the Act of March 26, 1867, § 6, P. L. 547, empowered the Commissioners of Fairmount Park to appropriate additional land only when authorized by ordinance of Councils. Section 4 of this same act merely empowered and directed the commissioners to adopt a plan for the improvement and maintenance of the park, but this clearly vested in them no authority to extend or alter its boundaries. The Act of April 14, 1868, § 13, P. L. 1083, authorized the commissioners to acquire title to land that might lie partly within and partly without the boundaries of the park, and to sell and convey such part as should lie outside the boundaries by deeds to be signed by the mayor under the seal of the City, to be affixed by direction of Councils, either for cash or part cash and mortgage. It is obvious, therefore, that neither of these acts applies to the present case. What the commissioners do rely upon, assuming that they have the same powers over the Parkway as they have over Fairmount Park, is the Act of April 21, 1869, P. L. 1194, and we thus arrive at the question:

*Would the Act of April 21, 1869, P. L. 1194, give to the Commissioners of Fairmount Park the authority to make an exchange of property such as attempted by them in the present case, even were the attempt made with reference to Fairmount Park instead of the Parkway?*

The Act of April 21, 1869, § 5, P. L. 1194, authorized the Commissioners of Fairmount Park to negotiate and agree with owners of ground bounding upon the park and requisite for the proper location and adjustment of the boundary avenues as to the price and conveyance thereof, and to that end to take and receive additional ground or make exchanges or releases, as the case may require, provided that the area of the park shall not be increased thereby. This authority, however, is conditioned upon the circumstance that the laying out and adjusting the grades of the boundary avenues of the park should reveal a configuration of the ground that would make it advantageous to vary from the boundaries theretofore established. It is evident, therefore, that this section of the Act of 1869 does not apply, because the present case did not involve any laying out or adjusting of grades and a configuration of the ground that called for a change of boundaries.

By section 2, however, of the same act it is provided: "That the Fairmount Park Commissioners shall have power, on behalf of the City of Philadelphia, to adjust the boundaries of said park with any railroad or canal company whose track, tow-path or canal navigation lies within or is bordering

upon said park, and with any other owner bounding upon the park, and to receive and make the proper conveyances or releases in adjusting said boundaries as now provided by law; and if an increase of width be conceded to any company or companies or individuals, or an exchange of property be made, it shall be at a rate of compensation not less than a just and proportionate share of the cost of the whole property paid at any time by the City of Philadelphia, with lawful interest thereon, which compensation shall be paid into the sinking fund of said city for the extinguishment of the park loan." It is this section of the act upon which the commissioners rely as the source of their authority to make the exchange of properties with Spangler.

There are, in our opinion, two reasons why this provision cannot be successfully invoked by the defendants.

The first is that the act provides for the adjustment of boundaries only (as here applicable) "with any other owner bounding upon the park." It has been stated in the findings of fact that Spangler's land, Tract B, does not "bound" upon the Parkway, but that, on the contrary, it is distant from 135 to 140 feet therefrom. There can be no boundary between two lands to adjust unless the lands are contiguous. A "boundary" is defined in Bouvier's Law Dictionary as "any separation, natural or artificial, which marks the confines or line of two contiguous estates." Spangler owned no land within or bounding upon the Parkway, and, therefore, there could be with him no adjustment of boundaries. The exchange attempted in the present case was one of two entirely isolated and mutually independent tracts of land. It has been held that even two lots separated by a county road are not abutting estates: Holt *v.* City Council of Somerville, 127 Mass. 408 (1879).

The second reason why the court is of opinion that the Act of 1869 does not help the defendants is because it authorizes merely an adjustment of boundaries. Even if Spangler's land did abut on the Parkway, it is not believed that the authority to "adjust boundaries" would permit the deeding away of a part of the Parkway and the acquisition in exchange of an entire and distinct lot situated at a distance from the land so deeded and on the opposite side of the Parkway. The phrase "adjusting boundaries" is one well understood both in legal and general phraseology. Where two tracts of land abut on one another — that is to say, are contiguous — an adjustment of boundaries involves a change therein whereby the areas of the two tracts may be altered, but the tracts themselves, as thus altered, remain in their previous ownerships. Even if, therefore, Spangler's land, Tract B, had abutted on the Parkway, a transaction by which his entire tract was deeded to the City of Philadelphia could scarcely be said to be an adjustment of boundaries between his tract and that of the Parkway, even if in exchange for his land there was given to him another tract belonging to the City at a remote point.

Indeed, if the defendants' contention were correct, it would involve this necessary but startling result, namely, that the commissioners could deed away any part of the Parkway at their pleasure by obtaining as a consideration therefor land elsewhere situated, and even if such latter land did bound upon the Parkway, the result would be that the commissioners could, of their own accord, change the entire line of the Parkway. They could deed away an entire lengthwise half of it in exchange for a long strip bounding it on the other side, and thus remove the Parkway sidewise to the northeastward or southwestward of its present location. Or they could widen or narrow it at various places as they might see fit. This may seem like a farfetched *reductio ad absurdum,* but it is permissible to consider it in determining

Philadelphia *v.* Spangler et al.

whether or not the legislature could ever have intended to vest the commissioners with any such authority independently of the will of the municipal legislature.   In short, if the commissioners have the power contended for, they, and not Council, would be enabled to determine the length, the width and the location of the entire Parkway or, even as applied to Fairmount Park, of that great pleasure ground of the people.   As a matter of fact, what the commissioners were really attempting to do in the present case was to purchase additional land and pay for it with other land belonging to the City of Philadelphia, and this they clearly had no right to do.

We, therefore, arrive at the conclusion that there is no statute which gives to the commissioners the power claimed by them, even if Fairmount Park, and not the Parkway, were involved, and, of course, it must be, and is, conceded by them that unless they can rest their case upon some statutory authority, they have no ground upon which to base their contention.

### Is the City estopped from denying the power of the commissioners?

It need hardly be said that a municipality is not estopped from pleading *ultra vires* on the part of any one purporting to act on its behalf.   Evidence was offered by the defendants to the effect that on some previous occasions the commissioners had undertaken to adjust boundaries by virtue of the authority conferred by the Act of 1869.   As stated, however, in the findings of fact, in each of these instances the exchange was made by the commissioners for land actually bounding upon the park, so that none of them establishes a precedent for the action taken by the commissioners in the present case.   In any event, however, the commissioners cannot enlarge their statutory powers by usage, nor can they acquire a power by purporting mistakenly to have it, no matter how many times such attempts be made, and even though without challenge.   Neither is the City of Philadelphia estopped by reason of the fact that Mr. Neeld, Chief of the Bureau of City Property, was present at the meeting of the commissioners on Dec. 8, 1926, at which the proposed exchange of lands was approved, and that he voted in favor thereof.   Mr. Neeld is a member of the Park Commission *ex officio*, but in attending and acting at meetings of the commissioners he is a commissioner and not a municipal officer.   Moreover, even as Chief of the Bureau of City Property, he had no authority to bind the City to such a transaction, and his sitting as one of the commissioners added nothing to his official powers.

Having thus determined, for the various reasons set forth, that the agreement of Dec. 9, 1926, and the exchange of deeds thereunder, was beyond the power of the commissioners, and that, therefore, the transaction is illegal and void, it would be unnecessary to add anything more to this discussion. Since, however, it was contended by the plaintiff, the City of Philadelphia, that even if the commissioners had the power in question, they exercised it improperly and illegally, it is deemed best to discuss the points involved in that phase of the question also, in order, as already stated, that the record may be complete for consideration upon appeal.

It is contended by the plaintiff that even if the commissioners had the authority to enter into such a transaction as that herein involved, their exercise of such power in the present case was illegal for several reasons, and the questions thus submitted by the plaintiff will now be discussed.

### Did the exchange of Tract A for Tract B constitute an abuse of discretion on the part of the commissioners, assuming, for the sake of argument, that they were vested with any power or discretion to act?

The City contends that there was such disparity in the values of Tracts A and B as to make the exchange one involving an abuse of discretion. The court has found that Tract A, deeded by the commissioners, was of a fair market value of $350,450, and that Tract B, received or to be received from Spangler, was of a fair market value of $221,300. As far as the value of Tract A is concerned, of the seven expert witnesses called by the City and the four expert witnesses called by the defendants, all, with but one exception, a defendants' witness, placed a valuation thereon of at least that amount, although some of the defendants' witnesses qualified their valuation by stating that it was based upon the theory that buildings thereon could be erected to a height of 245 feet, but that if the limitation was eighty feet the property would be of less value. (This question of building restriction is discussed herein later.) The court thinks, therefore, that the valuation adopted by it is conservative and entirely fair to the defendants. As far as Tract B is concerned, five of the expert witnesses produced by the City of Philadelphia valued the tract at $15 a square foot, and, the acreage being 13,832.3 square feet, this would mean a valuation of approximately $207,500; and these witnesses all further stated that if the corner property, No. 2139 Vine Street, was not included, the rest of the tract would be worth only $12 or $13 a square foot; that is to say, about four-fifths of the value just stated. The four expert witnesses called by the defendants placed valuations upon this tract ranging from $22 per square foot, or a total valuation of approximately $304,000, to $25 per square foot, or a total valuation of approximately $346,000. On this tract, therefore, there was a marked discrepancy between the witnesses for the plaintiff and the witnesses for the defendants. The court, however, has had no difficulty in arriving at the actual finding that the value of Tract B, while perhaps somewhat higher than that given by the plaintiff's witnesses, was considerably less than that testified to by the witnesses for the defendants. Attention is called to the fact that Spangler purchased nine of these properties immediately before the deal with the commissioners was consummated, and actually paid for them only $206,760. For the tenth, namely, No. 309 North Twenty-second Street, he paid $28,320; the eleventh and final property, No. 2139 Vine Street, has not yet been acquired, but it was testified that, irrespective of the result of the condemnation proceedings now pending, the owner has offered to accept for this property a price of $40 per square foot, which would amount to $36,720. Taking this maximum, the total amount paid by Spangler for the entire Tract B would be $271,800, which alone, in the opinion of the court and apart from other considerations developed in the testimony, would stamp the valuations placed upon Tract B by the four experts of the defendants as being obviously excessive. As a matter of fact, Spangler admitted that his original purchases were made at the rate of $12 per square foot, but that, as it became known that he was assembling these properties, the prices naturally were raised, and the later properties, though intrinsically worth no more than the earlier ones acquired, had to be purchased at a much greater rate per square foot, which, of course, could not have happened if all the properties had been originally condemned by the City at the same time. Taking into consideration, therefore, the maximum placed upon Tract B by the city experts, the price actually paid by Spangler under the conditions above stated and the valuations fixed by the defendants' witnesses, and considering all the other evidence bearing upon the matter, the court found the value of Tract B to be $221,300, being at the rate of $16 per square foot. The court is of opinion that this is a liberal estimate of the fair market value of Tract B; but even

if it be mistaken in such finding, the real value can be little greater than that thus fixed.

The findings of fact would thus indicate a difference in the values of the two tracts exchanged of $129,150.

In concluding, as we do, that so great a difference in the market value of the two tracts must be held to indicate an abuse of discretion on the part of the commissioners, even if they had the power to make the exchange at all, it must be stated that the court has no thought whatever to the effect that the commissioners were actuated by any improper motives in effecting the exchange, or that they acted otherwise than in good faith. They were probably eager to expand the width of the Parkway on its lower side west of Twenty-first Street, as fixed by the Ordinance of Council of June 8, 1909, and confirmed Sept. 20, 1909; there were no appropriations available to them to purchase additional parkway lands, and so they resorted to the expedient of attempting to acquire the tract which they desired by paying for it in other land of the City of Philadelphia which, in their opinion, was not necessary for the purposes of the Parkway as they conceived such purposes, although in the attempt to further this opinion they were setting themselves against the opinion and judgment of the Council of the City, which had included Tract A in the Parkway only six weeks before the commissioners, deeming it an undesirable addition to the Parkway, agreed to deed it away to Spangler. The question, however, of honesty of intention and of good faith does not enter into the determination of whether or not there was an abuse of discretion. As stated in 1 Corpus Juris, 372, abuse of discretion is "a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence; a clearly erroneous conclusion and judgment— one that is clearly against the logic and effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing;" and the cases there cited show that the great weight of authority is to the effect that a bad motive or wrong purpose, a wilful abuse or intentional wrong, is not a necessary factor in determining that there has been an abuse of discretion. However unimpeachable the motives of the commissioners, the disparity in values between the two tracts is such as to make it impossible judicially to justify the transaction as a defensible exercise of discretion by agents dealing with public property, but, on the contrary, renders the act of the commissioners one which in law amounted on their part to an abuse of any discretion with which they may have been vested. Indeed, it is obvious that if the result desired by the commissioners was to be accomplished at all, it could and should have been brought about by the City of Philadelphia selling Tract A in the open market and with the proceeds purchasing or condemning Tract B; a procedure that certainly would have brought into the City Treasury a considerable surplus resulting from the transaction.

It is contended by the City of Philadelphia that the difference in values between the two properties must be determined to be even greater than that here presented, because the title to Tract B, given by Spangler to the City, was not one in fee simple, but only "for the uses and purposes of the Parkway, and for no other use or purpose whatever, with the same effect as if the said land had been included within the original boundaries of said Parkway," and, therefore, as a base fee, the title would revert to the grantor should the City ever abandon the property for park purposes or attempt to sell it, and consequently the land had no market value whatever. On the other hand, it is contended by the defendants, with reference to the valuation of Tract A, that

by an ordinance of Council the height of buildings erected on said tract was limited to a maximum of eighty feet, and that, in addition, the commissioners themselves expressly placed such a restriction in their deed in order to insure the freedom of the Parkway from too lofty abutting buildings, and that this rendered Tract A less valuable. It is true, of course, that the limited title to the Spangler lot deed to the City entirely destroyed its market value. On the other hand, it must be admitted that an eighty feet limitation in the height of buildings that might be erected on Tract A would reduce the market value of that property; the only witness for the defendants who fixed a valuation on Tract A on the basis of such eighty feet restriction valued it, under such conditions, at $261,000, and the court has practically adopted that figure by finding the value of Tract A, if thus restricted, to be $262,850.

The question thus arises whether the contention of the commissioners is correct that such restriction existed on Tract A by virtue of an ordinance of Councils, and whether, if it did not so exist, the commissioners themselves had power to place such a restriction thereon in their deed to Spangler, and thereby, by their own act, reduce the market value of the property.

*Did the Ordinance of March 21, 1917 (page 81), limit the height of buildings on Tract A to 80 feet; and, if not, could the commissioners themselves so limit it?*

The Ordinance of March 21, 1917 (page 81), provides, generally speaking, that no building, any portion of which may come within the boundary-lines of the Parkway between Broad Street and Eighteenth Street or within 200 feet therefrom, should thereafter be erected, altered or used, exceeding, as to its main cornice-line, 200 feet in height above the street level, or 245 feet as to any portion of said building, and that no building, any portion of which may come within the boundary-lines of the Parkway or Logan Square, between Fairmount Park and Eighteenth Street or within 200 feet therefrom, should thereafter be erected, altered or used exceeding, as to its main cornice-line, eighty feet in height above the street level, or as to any portion of said building 100 feet if the building was between Fairmount Park and the Crescent and 160 feet if between the Crescent and Eighteenth Street. Tract A is situated between Broad Street and Eighteenth Street, and, therefore, apparently would come within the former of the two classes above provided for. The defendants contend, however, that because Tract A is within 200 feet of Eighteenth Street, it falls within the latter of the two classes, and the buildings thereon are thereby limited (as to their main cornice-lines) to a height of eighty feet; in other words, that the eighty feet limitation is made to extend by the second part of the ordinance to the section between Fairmount Park and Eighteenth Street and "within 200 feet therefrom," and so applies to Tract A which is within 200 feet (east) of Eighteenth Street. This contention, however, would seem to be without merit. It might just as well be argued that if a building were situated within 200 feet west of Eighteenth Street, it would, therefore, fall within the first of the two classes provided for in the ordinance, and that it would consequently be restricted only to 245 feet in height, that is, to the same restriction as governs the buildings east of Eighteenth Street. As a matter of fact, the ordinance shows a clear intention on the part of Councils to permit buildings 200 feet in height (as to their main cornice-lines) between Broad Street and Eighteenth Street, and eighty feet in height between Eighteenth Street and Fairmount Park. When the ordinance uses the expression "or within 200 feet therefrom," the word "therefrom" refers not to Eighteenth Street, but to the Parkway. If a building is

situated between Broad Street and Eighteenth Street, it is limited to 200 feet as to its main cornice-line, if any portion of it is situated within 200 feet of the Parkway; if a building is situated between Fairmount Park and Eighteenth Street, it is limited to eighty feet as to its main cornice-line, if any portion of it is situated within 200 feet of the Parkway or of Logan Square. (A similar instance of such use of the expression "within 200 feet therefrom" is to be found in the Ordinance of June 1, 1909, page 153.) If it referred to Eighteenth Street, there would be this absurd result, that the height limitation of eighty feet would run from Fairmount Park to a distance of 200 feet east of Eighteenth Street, and, on the other hand, the height limitation of 200 feet would run from Broad Street to a point 200 feet west of Eighteenth Street, so that in the area of 400 feet (200 feet on each side of Eighteenth Street), there would be a conflicting limitation.

Neither, in the opinion of the court, did the commissioners have the power independently of this ordinance to place an eighty feet restriction of their own on the land deeded by them to Spangler. In deeding this land they were taking it out of the Parkway and making it an abutting property, and they have no apparent statutory authority to determine the heights of buildings along the Parkway; their control and their power die, in any event, outside the Parkway lines. Indeed, it is provided in the Act of May 11, 1915, § 1, P. L. 285, that the park commission of any city of the first class may make regulations as to the location, size and use of buildings, any portion of which shall come within 200 feet of any park, parkway, playground or other public place under its care or management, and, upon their approval by the councils of said city, said regulations shall have the same effect as if originally made by said councils—thus showing that, so far from the legislature having vested in the commissioners power to make such regulations, it has expressly provided for the approval by councils thereof as necessary to their legal effectiveness. There would, therefore, seem to be no basis for contending that the commissioners had the power themselves to restrict the height of buildings on the land which they were conveying, and thus to curtail the value of the city's property conveyed by them, and then to claim that, as thus reduced, its fair market value was brought down closer to the lower value of the Spangler land.

It is urged by the defendants that, even if their construction of the Ordinance of March 21, 1917, and of their own power in regard to restricting Tract A was incorrect, they honestly believed the law to be to the contrary, that they acted in good faith, and that, therefore, no abuse of discretion on their part was involved. The answer to this contention would seem to be that no one is excused because of a misinterpretation of law, and that, in any event, and as has already been pointed out, the element of good or bad faith does not enter into the determination of the question as to whether or not there has been, within the eye of the law, an abuse of discretion.

*Was the deed given by the commissioners to Spangler properly executed?*

The City contends that since the title to Tract A was in the City of Philadelphia, a deed conveying it had to be signed by the Mayor in order to be valid, and in justification of this contention points to the Act of April 14, 1868, § 13, P. L. 1083, hereinbefore referred to, which provides for the Mayor signing deeds in cases where the Commissioners of Fairmount Park seek to convey title to the parts of properties which lie outside the boundaries of the park and where the remaining parts of the properties lie within the park; to the Act of May 15, 1871, § 3, P. L. 873, which provides for execution by the

Mayor of deeds given for certain exchanges of land in connection with Hunting Park, and to the Act of April 4, 1872, § 2, P. L. 900 (a supplement to the last mentioned act), which contains a similar provision. However, the Act of April 21, 1869, § 2, P. L. 1194, under which the commissioners claim their present power, gives them the right to make proper conveyances in adjusting the boundaries, and, notwithstanding the provisions of the acts just cited governing the specific cases therein provided for, it would seem that the grant to the commissioners of the powers to adjust the boundaries of Fairmount Park in proper cases and to make the proper conveyances thereunder would enable them inferentially to do everything necessary to carry such authority into effect, and, therefore, to do as they did in the present case, namely, to sign their own deed as commissioners and to authorize an attorney-in-fact to acknowledge the same. If the Mayor's signature were required, it would have been at best merely a ministerial act on his part, and its performance could have been compelled in a proper case. In any event, even if the deed be improperly executed, only Spangler, not the plaintiff, would be harmed thereby and could be heard to complain.

*Did the commissioners have the right to condemn the property No. 2139 Vine Street (northeast corner of Twenty-second and Vine Streets) in order to obtain it as part consideration for their deed to Spangler?*

The plaintiff contends that this condemnation was effected by a resolution of the Committee on Land Purchases and Damages of the Commissioners of Fairmount Park instead of by the commissioners themselves, but in fact the committee proceeded under and in pursuance of the authority given to it by the resolution of the commissioners of Dec. 8, 1926, and there would seem to be no reason why the commissioners could not exercise their power through the agency of their own committee.

The plaintiff further contends that the commissioners had no right to exercise their power of eminent domain for the benefit of an individual, and merely to enable Spangler to carry out his agreement. However, the contract of Dec. 9, 1926, provided that the commissioners would condemn this property if Spangler would insure the payment to them of the damages that might be awarded for said condemnation, and this Spangler did. If the commissioners had power to condemn the property, their motive in doing so would be immaterial; they did not assign their power of eminent domain to Spangler, but merely exercised it for the purpose of carrying out the general agreement.

A more effective attack made by the plaintiff in regard to the validity of this condemnation is that based upon the fact that at the time of the appropriation and condemnation of the property no appropriations had been made by Council to the Commissioners of Fairmount Park sufficient for its acquisition, condemnation and purchase, but that, on the contrary, there were then other condemnation proceedings which had been begun by the commissioners for other lands which more than exhausted all appropriations that had been made by Council for such purposes. Debts cannot be contracted or liabilities incurred by governmental agencies, except in pursuance of appropriations previously made therefor by the proper authority, in this case the Council of the City.

Still another objection to the legality of the proceedings to condemn the property No. 2139 Vine Street is that there exists no statutory authority on the part of the commissioners to condemn any land unless it is either within or at least adjoins a public park within the City. The Act of April 24, 1903, P. L. 294, conferred upon the commissioners the right to purchase, acquire,

enter upon, take, use and appropriate, for public park purposes, farmlands and woodlands adjoining and bounding land "now" used for park purposes, where in the opinion of the commissioners the said land should be necessary for the improvement of the said parks, provided that the total acreage of all lands so taken should not exceed 1000 acres, and this power was broadened by the amending Act of May 28, 1915, P. L. 578, to authorize the commissioners to purchase, acquire, enter upon, take, use and appropriate for public park purposes private property adjoining any public park whenever, in their opinion, such property should be necessary for the improvement of said park. These acts, however, are unavailable for the defendants. They are restricted to the condemnation of property "adjoining" a park, and the word "adjoining" is defined in Bouvier's Law Dictionary to mean "touching or contiguous, as distinguished from lying near or adjacent. The words 'along' and 'adjoining' are used as synonymous terms, and, as used in a statute, imply contiguity, contact." The property No. 2139 Vine Street does not "adjoin" land acquired by the City for park purposes, unless the conveyance taken by the commissioners from Spangler for the other ten properties of Tract B was itself valid, and, for the reasons heretofore indicated, such was not the case; indeed, the Spangler land was deeded to the City not for a park but for the Parkway. Moreover, it is to be pointed out that the same objections which apply to the constitutionality of the Act of April 17, 1913, P. L. 93, apply also to these acts and with the same force, and, in any event, the grant of powers made therein could not be held to extend to the Parkway if the Act of April 17, 1913, is, as we have held, unconstitutional.

It would, therefore, seem that the commissioners could not legally condemn the property No. 2139 Vine Street. The result of this conclusion might not affect the transaction as a whole, since the partial failure of the consideration to be received for Tract A might not render the transaction void as to Spangler, he not being responsible for such failure. If, however, the court is correct in determining that this property cannot be legally acquired by the City under the condemnation proceedings undertaken by the commissioners, at least the value of the consideration obtained from Spangler is greatly reduced, and the disparity in value between Tracts A and B becomes correspondingly greater.

This disposes of all the points raised by either party in the issue now before the court, and, in accordance with the conclusions at which we have thus arrived, the court finds the following as

## Conclusions of law.

1. The Resolutions of Council of Jan. 3, 1920, and Oct. 26, 1926, approved and signed by the Mayor, are valid and effective, and brought into the Parkway the part of Tract A at Eighteenth and Race Streets which had not theretofore been included therein. It was not legally necessary for this purpose that the new lines should be confirmed and placed on the city plan by the Board of Surveyors.

2. The lines of the Parkway can be fixed and determined only by Council, with the approval of the Mayor. These authorities never adopted the so-called "Greber Plan" as fixing or constituting the Parkway boundaries, and that plan has no official status.

3. The fact that Tract B, at Twenty-second and Vine Streets, is within the lines of the so-called "Greber Plan" does not bring it into the bed of the Parkway. It is not within the Parkway, neither does it adjoin, bound or abut on the Parkway.

4. The Act of April 17, 1913, P. L. 93, attempting to vest in commissioners of public parks in cities of the first class all such powers and control over parks, parkways and other grounds that might thereafter be committed to their care and management by the councils of said cities or by individuals as they then had or might thereafter acquire over public parks placed in their charge by any law of the Commonwealth, is unconstitutional, in that it delegates to special commissions power to supervise and interfere with municipal improvements and property and to perform municipal functions, and, therefore, violates article III, section 20, of the Constitution of Pennsylvania. It also violates article III, section 7, of the State Constitution, because it applies only to the City of Philadelphia, and no other city can ever in fact come within its provisions, and, therefore, it is a local and special law regulating the affairs of cities.

5. The Ordinance of Councils of May 20, 1915 (page 185), enlarging Logan Square and placing said square and several other squares and the Parkway under the care and management of the Commissioners of Fairmount Park, is invalid, in that it violates the provisions of the Act of May 23, 1874, § 3, P. L. 230, by containing more than one subject.

6. The Parkway has never validly been brought under the care and management of the Commissioners of Fairmount Park.

7. By a proper ordinance the Parkway may be brought under the care and management of the Commissioners of Fairmount Park in accordance with the provisions of the Act of April 21, 1869, § 6, P. L. 1194, which authorized the commissioners to accept the care and management, from time to time, of grounds then appropriated or thereafter to be appropriated for park purposes within the City of Philadelphia. In that event, however, the commissioners would have only the right to "care" for and "manage" the Parkway, and they cannot, since the adoption of the Constitution of 1874, obtain any greater rights than this over the Parkway. Such right is merely regulative and administrative and does not and cannot include the special powers (other than those of "care" and "management") given to them over Fairmount Park by the Acts of March 26, 1867, P. L. 547, April 14, 1868, P. L. 1083, and April 21, 1869, P. L. 1194, which the Act of April 17, 1913, P. L. 93, attempted to extend to certain city squares and the Parkway, as, for example, the power to make exchanges of city lands within or abutting on the park in order to adjust boundaries, the power to vacate streets within the park, the power to license passenger railways therein, and the like.

8. The Commissioners of Fairmount Park have not the power with reference to the Parkway to adjust boundaries which they have with reference to Fairmount Park by virtue of section 2 of the Act of April 21, 1869, P. L. 1194.

9. Even if they had such power, it would not legally justify the exchange of properties attempted in the present case, because the Act of April 21, 1869, P. L. 1194, provides for the adjustment of boundaries only with an owner bounding upon the park, and Spangler had no land bounding upon the Parkway; and also because the power to "adjust boundaries" does not authorize the exchange of an entire city tract for an entire tract of an owner at some distant point, even though abutting on the Parkway.

10. The fact that the commissioners on several previous occasions undertook to adjust the boundaries of the park does not work any estoppel against the City of Philadelphia in the present case, especially as the exchanges there made by the commissioners were all for lands actually bounding upon the park.

11. A municipality cannot be estopped from pleading *ultra vires* on the part of anybody purporting to act on its behalf.

Philadelphia *v.* Spangler et al.

12. The City of Philadelphia is not estopped in the present case because of the fact that the Chief of the Bureau of City Property, who is *ex officio* one of the Commissioners of Fairmount Park, attended the meeting of the Commission at which the exchange of lands with Spangler was approved, and that he voted in favor thereof.

13. Even if the commissioners had the power, in their discretion, to make the exchange of lands attempted in the present case, the disparity in the market values of the two tracts was so great that the transaction constituted in law one involving an abuse of discretion on the part of the commissioners, even though they acted in good faith, and even though they believed, but erroneously, that the tract which they were conveying was subject to greater building restrictions under ordinances of Councils than in fact existed.

14. The Ordinance of Councils of March 21, 1917 (page 81), placing certain restrictions upon buildings, any portion of which came within the bounary-lines of the Parkway or within 200 feet therefrom, did not restrict the maximum height of a building that might be erected, altered or used on Tract A to eighty feet, but only to 200 feet as to its main cornice-line and 245 feet as to any portion of it.

15. The commissioners were without authority in law to place a building restriction on Tract A greater than that provided by ordinances of Councils, even if they had authority to convey the property at all.

16. If the commissioners had the legal authority to convey Tract A on behalf of the City of Philadelphia in exchange for Tract B, it was not necessary that the deed making the conveyance should be signed by the Mayor, but it was sufficient that it was executed by the commissioners on behalf of the City and acknowledged by an attorney appointed by them for that purpose.

17. Where the commissioners have the legal right to condemn land, they may invest a committee of their own number with authority to effect the condemnation; neither is the condemnation rendered invalid because employed in order to facilitate the carrying out by an individual of a contract on his part either to purchase the land and convey it to the City or to reimburse the City for such sums as the City might be obliged to expend for it in such condemnation proceedings.

18. The commissioners, however, were without authority to appropriate and condemn the property No. 2139 Vine Street, because there existed no balance of any appropriation previously made by Council sufficient to pay the awards therefor, and also because such property did not adjoin a public park (the acquisition of the remaining part of Tract B from Spangler being invalid and illegal, and that acquisition being not for a park but for the Parkway), and also because the Acts of April 24, 1903, P. L. 294, and May 28, 1915, P. L. 578, are unconstitutional, and also because, in any event, their provisions could not be constitutionally extended to the Parkway by the Act of April 17, 1913, P. L. 93.

19. The deed dated Jan. 12, 1927, from the Commissioners of Fairmount Park to Spangler is a cloud on the title of the City of Philadelphia to the land, Tract A, therein attempted to be conveyed.

20. The plaintiff, the City of Philadelphia, is entitled to have the two deeds of Jan. 12, 1927, canceled and decreed null and void.

21. No relief being sought by the plaintiff against the defendant, The Philadelphia Club, and no title to Tract A having been acquired by the latter, the bill should be dismissed as to said defendant.

The court, therefore, enters the following

Philadelphia v. Spangler et al.

### Decree.

And now, to wit, Oct. 14, 1927, this cause having come on to be heard upon bill, answers and proofs, upon consideration thereof, it is ordered, adjudged and decreed:

1. That the deed dated Jan. 12, 1927, from the Commissioners of Fairmount Park to the defendant Spangler constitutes a cloud on the title of the City of Philadelphia to the land therein attempted to be conveyed.

2. That the defendant Spangler be and he hereby is ordered and directed to deliver up for cancellation the deed to him from the Commissioners of Fairmount Park, dated Jan. 12, 1927.

3. That the defendants, the Commissioners of Fairmount Park, be and they hereby are ordered and directed to deliver up for cancellation the deed from Spangler et ux. to the City of Philadelphia, dated Jan. 12, 1927.

4. That the two deeds aforesaid, dated Jan. 12, 1927, the one from the Commissioners of Fairmount Park to Spangler, and the other from Spangler et ux. to the City of Philadelphia, be and they hereby are decreed to be null and void.

5. That the bill be dismissed as to the defendant, The Philadelphia Club.

6. That the defendants, the Commissioners of Fairmount Park, pay the costs of these proceedings.

The prothonotary will enter this decree *nisi* and give notice of the same to the parties or their counsel, and if no exceptions are filed within ten days thereafter, either party may present to the court a form of final decree then to be entered.

GORDON, JR., and LEWIS, JJ.—In accordance with the request of counsel for all parties, we sat with the President Judge to hear the testimony and argument thereon in this case, and concur in this adjudication.